**APOLLO INDUSTRIES, INC., Etc.,**
**Petitioner,**

v.

**COMMISSIONER OF INTERNAL REVENUE, Respondent.**

**No. 6621.**

United States Court of Appeals
First Circuit.

March 8, 1966.

Stephen N. Subrin, Boston, Mass., with whom Lawrence M. Levinson and Jack H. Calechman, Boston, Mass., were on brief, for petitioner.

Fred E. Youngman, Atty., Dept. of Justice, with whom Richard M. Roberts, Acting Asst. Atty. Gen., and Lee A. Jackson and David O. Walter, Attys., Dept. of Justice, were on the brief, for respondent.

Before ALDRICH, Chief Judge, and McENTEE and COFFIN, Circuit Judges.

COFFIN, Circuit Judge.

The petition for review in this case challenges the Tax Court's decision determining deficiencies in the federal income taxes due from petitioner for 1956 and 1957 in the amounts of $50,486.82 and $42,124.18, respectively. The deficiencies are based on the Tax Court's conclusion that, during these years, the petitioner's predecessor was subject to an accumulated earnings tax (under 26 U.S.C. § 531) because it had been "availed of" for the purpose of avoiding shareholders' income taxes by accumulating earnings rather than distributing them as dividends (26 U.S.C. § 532). The subsidiary but very important question, bearing on purpose, is whether earnings were permitted to accumulate beyond the reasonable needs of the business.[1]

Taxpayer's predecessor was a cigar manufacturer, Alles & Fisher, Inc. (hereafter, Alles). It had been in the cigar business since 1918 and was the successor to a business founded in 1863. Its principal brands, best sellers in their class in New England, were the "63" and "J-A". Despite intense competition and attrition in the cigar-making field, Alles was able to increase its share of the market by its progressive and even pioneering use of machinery. The guiding force of Alles was Reuben B. Gryzmish (hereafter, Gryzmish), who, after experience in cigar manufacturing dating from 1905, had become Treasurer in 1920, and who, together with other members of his family, owned over 80 per cent of Alles' stock.

In 1955 Gryzmish became interested in the potential for the cigar industry of the use of reconstituted or homogenized tobacco.[2] It was his opinion that by using reconstituted tobacco Alles could approximately double the profit the corporation was then making on cigars. The advantages of the use of the product lay in the elimination of waste due to imperfections in natural tobacco and shrinkage in the drying process, in greater use of machine operations, and in the improved appearance of the final product. In fact, by 1964, 93 per cent of all cigars made in the United States contained homogenized tobacco.

In the spring of 1955 Gryzmish visited a pilot plant run by American Machine & Foundry Company in Brooklyn, New York. He obtained samples from which

---

1. 26 U.S.C. § 533.
   "§ 533. Evidence of purpose to avoid income tax.
       (a) Unreasonable Accumulation Determinative of Purpose.—For purposes of section 532, the fact that the earnings and profits of a corporation are permitted to accumulate beyond the reasonable needs of the business shall be determinative of the purpose to avoid the income tax with respect to shareholders, unless the corporation by the preponderance of the evidence shall prove to the contrary."

2. This product, created by grinding tobacco leaves to powder, mixing with water and a chemical adhesive agent, is in the form of thin, brown, pliable sheets on rolls and is used for making "binders" for cigars—the material surrounding the inner "filler" and, in turn, covered by the outer "wrapper".

he had cigars made by hand, and which he tested by giving samples to employees and others. In June he received from an American Machine & Foundry subsidiary a written quotation of $193,145.00 for a unit capable of producing 250,000 pounds of homogenized tobacco a year, together with a suggested plant layout. Gryzmish estimated that the cost of providing an adequate building would bring the cost to at least $500,000.00, and perhaps as much as $600,000.00 or even more.[3]

In July or August he visited Nu Way, the first plant licensed by American Machine & Foundry to make the new product. During 1956 Alles bought some of the reconstituted tobacco from Nu Way for experiment. Lack of uniformity of thickness, color, taste, moisture, and capacity to hold an ash all posed problems, but not, Gryzmish thought, insuperable ones. There were talks with Nu Way about production costs and the possibility of a joint operation. Gryzmish learned that the equipment alone had cost Nu Way $690,000.00. He preferred that Alles make its own product, accumulating the necessary funds out of earnings, if possible, and borrowing only if such funds were not sufficient. Other Alles directors, with whom he had discussed the project and its probable costs, were agreeable. Accordingly, Alles embarked upon a program of reducing the inventory of broad-leaf tobacco, from $1,079,-583.65 at the end of 1956, to $579,437.80 at the end of 1957.

In late 1956 and early 1957, Alles began to produce "63" cigars containing homogenized binders, marketing some on a test basis in March 1957. Despite some complaints, they were generally accepted. By the end of 1957, most, if not all, of the "63" cigars were being made with homogenized binders and the process had become economical. But, by this time, Gryzmish had entered into negotiations looking toward the sale of his and his family's interest in Alles and had orally agreed with the potential purchaser not to enter the new field.

Meanwhile, during 1956, a dispute developed between Gryzmish and his brother Mortimer over the latter's[4] refusal to deliver stock he had agreed to sell Gryzmish. It was resolved in January 1957 with the signing of mutual releases. A new agreement at a higher price was worked out. In June 1957, Gryzmish completed his purchase with the aid of an unsecured, interest fee loan from Alles in the amount of $160,000.00. Gryzmish had in the past consistently advanced substantial funds to Alles without security and at no interest and was ready and able to repay this loan at any time.

In October 1957, at the initiation of one of Gryzmish's accountants, a meeting took place between Gryzmish and one Friedlander, to discuss the possibility of sale of Alles. There was interest on both sides, a balance sheet was requested and Friedlander asked Gryzmish, pending the outcome of negotiations, to engage in no transactions outside of the ordinary course of business, such as acquiring substantial physical assets or paying dividends. Gryzmish agreed. A draft agreement was sent to Gryzmish on January 9, 1958, but final arrangements were not made until June 20, 1958. The agree-

---

3. The Tax Court based its deliberations on its understanding that "The petitioner has made its computations and based its arguments on brief primarily on the proposition that the amount needed for the project was $500,000." Petitioner asserts that this is a misunderstanding of the consistent testimony of Gryzmish, who used the $500,000.00 figure as a preliminary estimate of plant and equipment, to which he felt a contingency fund should be added. He acknowledged that the total project might run to $600,000.00 or even more. A 1962 estimate of costs of a building to house the machinery described in the 1955 quotation, including basement and utilities, was in the amount of $524,258.00. For present purposes we do not pass judgment but shall base our analysis on the $500,000.00 figure.

4. The Tax Court considered whether, had dividends been paid for 1956, there was any alternative to giving a windfall to Mortimer. Because of the view we take of the reasonable needs of the business in 1956, we do not reach this question.

ment contained a warranty that, from January 1, 1958 to the date of the agreement, the financial condition of Alles had not been adversely affected and no dividends had been declared. As it turned out, the buyer, not being experienced in cigar manufacturing, decided not to enter the manufacture of reconstituted tobacco.

Alles had paid a $.25 dividend per share each year from 1951 through 1955, the total amount ranging from $18,116.00 in 1951 to $19,666.00 in 1955. No dividend was declared or paid in 1956 or 1957, although Alles had net earnings after taxes of $120,578.51 and $126,902.82 respectively.[5] Neither Gryzmish nor his wife had federal income tax liability in 1956, because of a large loss which had occurred. The twelve shareholders of Alles who were members of his family had made charitable contributions in both 1956 and 1957 in excess of allowable deductions. Petitioner introduced in evidence a computation purporting to show that their overall taxes from capital gains would be higher than would have been the case if dividends of as high as $1.00 per share had been paid. Even if all after-tax earnings had been paid as dividends in both 1956 and 1957, Gryzmish and his family would have received in excess of $150,000.00 with an added tax of only $7,303.48, for both taxable years, over that estimated to be payable on sale of the stock.

The remaining facts are contained in Alles' financial statements. The data relevant to decision are derived from the balance sheets, statements of net liquid assets, costs of materials, operating costs, and certain daily averages. For convenience, we set these forth in the Appendix.

The Tax Court, first finding that earnings had been permitted in both 1956 and 1957 to accumulate in excess of reasonable needs, decided that Alles had been availed of for the purpose of avoiding the shareholders' income taxes. It did not decide, nor find it necessary to decide, whether Alles' plans to manufacture reconstituted tobacco were sufficiently specific, definite and feasible[6] to meet the requirement of "reasonably anticipated needs" of 26 U.S.C. § 537. Its conclusion was that "in any event the facts show that sufficient funds were available to the corporation to cover the alleged needs of the project without accumulating any earnings for 1956 and 1957". It assumed that these needs were in the amount of $500,000.00.[7]

In reaching its conclusion that earnings accumulated beyond the reasonable needs of Alles, the Tax Court made the following points: (1) working capital as of the end of 1956 was $1,299,357.49, while as of the end of 1957 it was $1,332,498.74;[8] (2) significant amounts of the current assets, $817,916.29 in 1956, and $1,030,291.57 in 1957, were "in a highly liquid form", i. e., cash, accounts receivable, securities, and Gryzmish's note; (3) not only were inventories reduced by $500,000.00 in 1957—"an amount equal to the claimed needs for the reconstituted tobacco project"—but this source of increasing liquid funds should have been anticipated as of the end of 1956; (4) it

5. These figures are from petitioner's brief. The record before us does not disclose the figures used in making the final computation of deficiencies.

6. Treas. Reg. § 1.537–1(b) (1) provides in pertinent part:
   "Reasonable anticipated needs. (1) In order for a corporation to justify an accumulation of earnings and profits for reasonably anticipated future needs, there must be an indication that the future needs of the business require such accumulation, and the corporation must have specific, definite, and feasible plans for the use of such accumulation. Such an accumulation need not be used immediately, nor must the plans for its use be consummated within a short period after the close of the taxable year, provided that such accumulation will be used within a reasonable time pending upon all the facts and circumstances relating to the future needs of the business. * * * "

7. See fn. 3, supra.

8. Quite properly, we think, it included as an asset in 1957 the note receivable from Gryzmish in the amount of $160,000.00.

rejected as inapplicable to Alles an estimate of its accountant as to the funds needed to continue ordinary operations.[9] On the last point the court specifically rejected the contention that "sufficient funds had to be available to pay operating expenses for an entire year", noting that 80 per cent of Alles' accounts receivables were less than one month old, that bad debt losses were minimal, and that "Alles had a healthy, going business which would of its own accord generate substantial funds through its normal operations in the course of a year".

■ In dealing with these conclusions as to the reasonable needs of the business we have in mind both the importance of this preliminary question in deciding the ultimate issue, Young Motor Co., Inc. v. Commissioner of Internal Revenue, 1 Cir., 1960, 281 F.2d 488, 490–491, and the rigorous standard that findings of the Tax Court must not be disturbed unless, in our opinion, they are "clearly erroneous". Commissioner of Internal Revenue v. Duberstein, 1960, 363 U.S. 278, 291, 80 S.Ct. 1190, 4 L.Ed.2d 1218; Young Motor Co., Inc. v. Commissioner of Internal Revenue, 1 Cir., 1964, 339 F.2d 481, 483.

■ The issue on which we differ with the Tax Court is not the factors to be taken into account in assessing reasonably anticipated business needs but rather the approach taken in attempting to weigh them. We accept, as did the Tax Court, the statement of factors to be considered, as made in Smoot Sand & Gravel Corp. v. Commissioner of Internal Revenue, 4 Cir., 1957, 241 F.2d 197, 207, where the court said:

"Working capital needs of businesses vary, being dependent upon the nature of the business, its credit policies, the amounts of inventories and rate of turnover, the amount of accounts receivable and the collection rate thereof, the availability of credit to the business, and similar relevant factors."

We differ, not in objective, but in our conviction that a more analytical scrutiny of the data relevant to each year's operations leads to different conclusions, assuming without deciding that the reconstituted tobacco project would have involved a cost of $500,000.00.

■ We do not think that a summary view of the balance sheet, or of working capital, or even of the amount of net liquid assets can give a court enough of an appreciation of the real needs of a business for operating funds. Business decisions are not made on the basis of information collected at arbitrary dates. They take into account the timing of needs and availability of resources. And so should judicial attempts to deal justly with these decisions. But to ascertain such needs and the resources available, we are required to go behind the simple balance sheet presentation of assets and liabilities.

Our analysis is similar to that followed in Bardahl Mfg. Corp. v. Commissioner of Internal Revenue, T.C.Memo.1965–200, CCH Tax Ct.Mem., Dec. 27,494(M), at 1033. In that case the court determined petitioner's need for working capital by computing the amount of cash reasonably expected to be sufficient to cover its operating costs for a single operating cycle. Such a cycle consists of the period of time required to convert cash into raw materials, raw materials into an inventory of marketable products, the inventory into sales and accounts receivable, and the period of time required to collect its outstanding accounts. No specific reason has been suggested to us, in brief or argument, why such an ap-

9. The accountant simply added accounts receivable, inventories, and annual figures for labor, manufacturing expenses, selling expenses, and fixed assets acquisitions and arrived at a total of $2,736,108.33, in 1956, or $860,829.71 more than capital stock and earned surplus combined. His estimate for 1957 was $2,090,013.85, or $133,035.72 more than capital stock and earned surplus. This may well be an accurate estimate of annual needs, but it substantially overestimates what is needed in cash in hand to assure continuity of operations.

proach is not appropriate. All that government counsel have said is that it "fails to take into consideration all of the relevant factors".

But, as we examine how the Tax Court dealt with these factors, we see that it proceeded directly from general observations on working capital, current assets, subsequent reductions in inventories, and the age of accounts receivable to the conclusion that "substantial funds" could be generated through normal operations. While we do not say that the Tax Court failed to "consider" all relevant factors, we are left in the dark as to how the court related and weighed these factors to arrive at its conclusion. This would not deeply concern us if the findings were in fact reasonable. We therefore pursue the approach used in *Bardahl*, not to sanctify it as applicable to all cases, nor to substitute our own determination of working capital needs for that of the Tax Court, but to test the reasonableness of the findings below.

The two elements composing the out-of-pocket costs of an operating cycle are costs of materials represented by inventory and the operating costs during the period required to collect accounts receivable. (We are ignoring the minor amounts of labor and overhead represented in the end-of-year inventories.)

Our first step is to estimate the costs of materials needed to be tied up in inventory. Ordinarily this would be done by: (a) dividing average inventory into annual costs of materials to get the frequency of turnover a year; (b) dividing total days a year by turnover frequency to get the days represented by inventory; (c) dividing annual costs of materials by total days a year to get average daily costs of materials; (d) multiplying (b) and (c) to get days' costs of materials tied up in inventory. In this case we are using the actual year end inventory figures, since in 1957, when inventory policy was in the process of change, we lack sufficient information to indicate what would be a fair average inventory figure. We set forth in the margin the various steps.[10]

Our second step is to estimate the operating costs required before accounts receivable are converted into cash. The

10. The computations of costs of materials tied up in inventory are as follows:

| | | 1956 | 1957 |
|---|---|---|---|
| STEP A: | | | |
| 1. | Annual costs of materials (See Appendix, table 3) | $1,081,416.04 | $1,033,722.08 |
| 2. | Actual year-end inventories (Appendix, table 1) | 1,079,583.56 | 579,437.80 |
| 3. | (1) ÷ (2) = turnover frequency | 1 | 1.92 |
| STEP B: | | | |
| 4. | Days a year ÷ (3) = days of cost of materials in inventory | 365 | 190 |
| STEP C: | | | |
| 5. | (1) ÷ days a year = average daily costs of raw materials | 2,963.00 | 2,832.00 |
| STEP D: | | | |
| 6. | (4) × (5) = days' cost of materials tied up in inventory | 1,081,495.00 | 538,080.00 |

(If average inventories were used, they would be derived as follows:

| | 1956 | 1957 |
|---|---|---|
| Beginning inventory (Jan 1) | $1,123,447.00 | $1,079,583.00 |
| Ending inventory (Dec 31) | 1,079,583.00 | 579,437.00 |
| Total | $2,203,030.00 | $1,659,020.00 |
| Average (total ÷ 2) | $1,101,565.00 | $ 829,510.00) |

following calculations are involved: (a) divide annual sales by total days per year to find average sales per day; (b) divide accounts receivable by average sales per day to obtain number of days' sales tied up in accounts receivable; (c) divide annual direct and indirect operating costs, excluding depreciation, by total days per year to arrive at daily operating costs; (d) multiply (b) and (c) to obtain the amount of operating costs to carry through the period required to reduce inventories to cash.[11]

In short, the approximate needs of Alles for working capital to cover one operating cycle were as follows:

|  | 1956 | 1957 |
|---|---|---|
| Costs of materials tied up for inventory turnover period ....... | $1,079,583.00 | $579,437.00 |
| Operating costs during collection period ........................ | 115,776.00 | 112,728.00 |
| Costs during operating cycle .... | $1,195,359.00 | $692,165.00 |

To provide for these needs Alles had net liquid assets (current assets less current liabilities; see Appendix, table 2) of $1,272,039.35 in 1956, and $1,332,498.74 in 1957.

First considering 1956, the amount available for the reconstituted tobacco project and dividends was $76,680.35 ($1,272,039.35 less $1,195,629.00). This, of course, falls far short of the $500,000.00 for the project, not to mention the funds required for the payment of dividends.

But, suppose there is a substantial error in our assumptions, and that, during

11. The computations for 1956 and 1957 are as follows:

|  | 1956 | 1957 |
|---|---|---|
| STEP A: | | |
| 1. Annual sales, net | $2,979,061.52 | $2,812,873.24 |
| 2. Sales ÷ total days (365) = 1 day's sales (Appendix, table 5) | 8,161.00 | 7,706.00 |
| STEP B: | | |
| 3. Accounts receivable | 219,453.85 | 216,166.57 |
| 4. (3) ÷ (2) = days' sales tied up in accounts receivable | 27 | 28 |
| STEP C: | | |
| 5. Annual operating costs (Appendix, table 4) | 1,565,110.43 | 1,469,336.04 |
| 6. Daily operating costs (Annual costs ÷ 365) (Appendix, table 5) | 4,288.00 | 4,026.00 |
| STEP D: | | |
| 7. Operating costs tied up in accounts receivable (4) × (6) | 115,776.00 | 112,728.00 |

1956, inventory on hand needed to tie up only nine months' cost of materials, rather than a year's cost. The arithmetic would be as follows:

| | |
|---|---:|
| Costs of materials tied up in inventory .......... (¾ of $1,079,583.00) | $809,687.00 |
| Operating costs during collection period ......... | 115,776.00 |
| Costs during operating cycle ........ | $925,463.00 |
| Available for reconstituted tobacco project and dividends ($1,272,039.35 less $925,463.00) .... | $346,576.35 |

———◆———

This, too, would have fallen far short of providing funds for the tobacco project alone. Indeed, only if, contrary to all the evidence, we were to assume that, in 1956, the year end inventory was twice as large as needed to cover an ordinary operating cycle, could Alles have come close to paying dividends equal to its earnings after taxes.[12] That such an assumption is unrealistic is evident from the fact that the 1956 inventory nearly equalled that at the end of 1955 (Appendix, table 1), and from Gryzmish's testimony that Alles, during these years, pursued a conservative inventory policy.[13]

There is one further point to note. The Tax Court, referring to the halving of inventories in 1957, said that this should have been anticipated at the end of 1956. We think the record does not support such a judgment as of that time. While it is true that Alles wanted to move in this direction, the feasibility of homogenized tobacco was still unknown in early 1957. In March 1957, Alles made its first public test by putting the new cigars on the market. Should these tests have been unsatisfactory, forward motion would have been arrested. Only by using hindsight could we say that dramatic inventory reduction was so foreseeable as of December 31, 1956 as to make unreasonable the withholding of dividends.

We therefore conclude that, on the Tax Court's view of the case (i. e., assuming that there was a reasonable business need for accumulating $500,000.00 to engage in the manufacturing of reconstituted tobacco), it was clearly erroneous in concluding that earnings could be paid out as dividends. Whether we describe the defect as failure of evidence to support the finding as to 1956 needs or as the commission of a mistake in dealing with the evidence, the result is the same. United States v. United States Gypsum Co., et al., 1948, 333 U.S. 364, 395, 68 S.Ct. 525, 92 L.Ed. 746.

12. On this assumption, amounts available for dividends would be calculated as follows:

| | |
|---|---:|
| Costs of materials tied up in inventory (½ of $1,079,583.00) | $539,791.00 |
| Operating costs during collection period | 115,776.00 |
| Total cycle costs | $655,567.00 |
| Available for project and dividends ($1,272,039.35 less $655,567.00) | $616,472.35 |
| Less estimate for reconstituted tobacco project | 500,000.00 |
| Available for dividends | $116,472.35 |

———◆———

13. He testified, "We always had an inventory of all types of tobacco, at least for a couple of year [sic]. And crops, you know, would vary by climate, nature and everything else. Sometimes we'd have a fine crop, and we'd buy more heavily."

Coming to 1957, we find, on this analysis, that $640,333.74 would have been available after meeting all working capital needs for an operating cycle ($1,332,498.74 net liquid assets less $692,165.00 costs for an operating cycle).

From this amount must come the $500,000.00 for the new venture and dividends of $126,000.00. This would leave only $14,333.74 for application toward the $108,000.00 contingent tax liability.

This presents a much closer case than 1956. On the one hand, further consideration might develop one or more of several factors indicating that dividends should have been paid. If the year end inventory was, with increased recourse to the purchase of homogenized tobacco, abnormally high, we may have exaggerated the normal operating needs of the business. A realistic estimate of tax liability might have been considerably lower than $108,000.00. Alles might not have insisted on financing every last dollar of the homogenized tobacco factory from company funds. We note that Gryzmish testified that he had approached banks in 1957 to investigate borrowing possibilities and that, if Alles lacked sufficient funds, "I would have to go to the bank or loan the company money myself as I have done in previous years". So far as Gryzmish's oral agreement with a prospective purchaser not to declare dividends is concerned, we are not impressed. The purchaser's negotiator testified that the only reason he opposed a dividend payment was that "we don't want to continually trade on the transaction". He acknowledged that had dividends been paid, the amount would simply have been deducted from the purchase price. Under these circumstances, we do not consider that the slight convenience of a potential purchaser is a sufficient argument to shield a potential seller from the declaration of a dividend. For this was a situation where withholding the declaration and payment of dividends would be neutral as to the buyer, while giving the seller a ready-made excuse for taking action which would maximize his gain.

But we cannot say, on the present posture of the case, that dividends were unreasonably withheld. The Tax Court assumed a $500,000.00 cost for the homogenized tobacco plant. While Gryzmish was not precise about the extent of additional costs, he at no time limited himself to that figure. If the project was in fact a reasonable business need and if the funds required were substantially in excess of $500,000.00, such findings would bear very substantially not only on the issue of unreasonable accumulation but also on the ultimate question whether there was a primary or dominant purpose to avoid shareholders' income taxes. Indeed it might be "the single most important consideration", Young Motor Co., Inc. v. Commissioner of Internal Revenue, 1 Cir., 1960, 281 F.2d 488, 491, or "the most persuasive fact", R. Gsell & Co., Inc. v. Commissioner of Internal Revenue, 2 Cir., 1961, 294 F.2d 321, 327. ...

As to 1956, assuming as does the Tax Court that it was proper for Alles to accumulate earnings for prospective entry into the manufacture of reconstituted tobacco, we disagree with its conclusion that sufficient funds would be generated through operations to cover both working capital needs and the payment of dividends. As to 1957, we disagree because a finding as to the reasonableness of the plan for manufacturing reconstituted tobacco—and the amounts reasonably required—is essential before decision can be reached on either the issue of accumulation or that of purpose.

The case must be remanded for answers, for each of the two taxable years, to the following questions: (1) was the reconstituted tobacco project a reasonably anticipated business need of Alles? (2) if so, what were its reasonable dimensions? (3) what were the practical needs of Alles for working capital?[14]

14. As we indicated above, we do not insist that the Tax Court adopt precisely the same method of computation that we have used herein, as long as its approach is set forth with clarity, and is responsive to the realistic needs of a functioning business enterprise.

and (4) even if accumulated earnings did not exceed reasonably anticipated business needs in one or both years, was avoidance of taxes on shareholders nevertheless a dominant purpose? In the meantime, we will retain jurisdiction.

## APPENDIX

### FINANCIAL DATA RELATING TO ALLES & FISHER, INC.

#### Table 1

*Balance Sheets*

| ASSETS | Dec. 31, 1955 | Dec. 31, 1956 | Dec. 31, 1957 |
|---|---|---|---|
| Cash ................ | $ 5,919.41 | $92,076.44 | $230,704.05 |
| Accounts Receivable ... | 233,587.32 | 219,453.85 | 216.166.57 |
| Inventory ............ | 1,123,447.08 | 1,079,583.65 | 579,437.80 |
| Prepaid expenses and supplies ............ | 10,049.84 | 18,216.39 | 8,370.38 |
| Note receivable — Reuben B. Gryzmish | | | 160,000.00 |
| Securities ............ | 210,584.26 | 516,886.00 [1] | 516,886.00 [1] |
| Land ................ | 27,041.49 | 27,041.49 | 27,041.49 |
| Building and other fixed depreciable assets (net) .............. | 386,915.82 | 398,519.21 | 356,641.27 |
| Intangible assets ...... | 201,653.28 | 151,352.45 | 101,051.63 |
| Other assets .......... | 18,134.46 | 23,004.51 | 51,945.78 |
| Total Assets ...... | $2,217,332.96 | $2,526,133.99 | $2,248,244.97 |
| **LIABILITIES AND CAPITAL** | | | |
| Accounts payable ......$ | 66,601.88 | $ 132,605.31 | $ 85,950.82 |
| Notes payable ......... | 146,000.00 | 280,000.00 [2] | |
| Accrued expenses and provision for taxes .. | 86,402.61 | 185,537.14 | 191,279.81 [3] |
| Mortgages payable .... | 5,379.77 | 4,483.28 | 3,536.21 |
| Other liabilities ....... | 99,505.84 | 37,729.64 | |
| Reserve for bad debts .. | 10,500.00 | 10,500.00 | 10,500.00 |
| Capital stock ......... | 322,125.29 | 322,125.29 | 322,125.29 |
| Earned surplus ....... | 1,480,817.57 | 1,553,153.33 | 1,634,852.84 |
| Total Liabilities and Capital ....... | $2,217,332.96 | $2,526,133.99 | $2,248,244.97 |

1. While figures for securities owned by Alles are carried at cost, their market value at December 31, 1956 was $527,297.50 and at December 31, 1957, $433,920.95.

2. This amount was payable to banks in connection with the purchase of securities.

3. Although not included in "Accrued expenses and provision for taxes", the 1957 balance sheet carried a footnote, reporting an assessment against the company for the years 1953, 1954, and 1955 in the amount of $108,687.62. The company was planning to contest the assessment and tax counsel felt that prospects were favorable. In fact, the claim was later settled at an amount which does not appear in the record.

### Table 2

#### Net Liquid Assets

|  | Dec. 31, 1956 | Dec. 31, 1957 |
|---|---|---|
| **CURRENT ASSETS:** | | |
| Cash | $ 92,076.44 | $ 230,704.05 |
| Accounts receivable (net after deducting reserve for bad debts) | 208,953.85 | 205,666.57 |
| Inventories | 1,079,583.65 | 579,437.80 |
| Securities — at market | 527,297.50 | 433,920.95 |
| Note receivable | | 160,000.00 [4] |
| Total | $1,907,911.44 | $1,609,729.37 |
| **CURRENT LIABILITIES:** | | |
| Accounts payable | $ 132,605.31 | $ 85,950.82 |
| Notes payable | 280,000.00 | |
| Accrued expenses | 185,537.14 | 191,279.81 |
| Due officer (Gryzmish) | 37,729.64 [4] | |
| Total | $ 635,872.09 | $ 277,230.63 |
| **NET LIQUID ASSETS** | $1,272,039.35 | $1,332,498.74 |

[4]. We include in liabilities the obligation of Alles to Gryzmish, arising from past advances, just as we include in current assets his obligation to Alles.

---

### Table 3

#### Costs of Materials

(derived from Alles' operating statements and schedules)

|  | 1956 | | 1957 | |
|---|---|---|---|---|
| Duty and brokerage | $871,637.29 | | $932,851.25 | |
| Freight and cartage | 68,714.83 | | 58,573.32 | |
| Tobacco | 26,377.44 | | 22,161.40 | |
| Storage | 672.00 | | 483.75 | |
| Total | | $ 967,401.56 | | $1,014,069.72 |
| Less net increase in scrap inventory | | 4,645.72 | | 12,514.15 |
| | | $ 962,755.84 | | $1,001,555.57 |
| Add decrease in inventory of cigars finished and in process | | 118,660.20 | | 32,167.31 |
| Year's Cost of Materials | $1,081,416.04 | | $1,033,722.88 | |

(We have not included in costs of materials the costs of revenue stamps—$354,796.02 in 1956 and $345,433.68 in 1957—on the assumption that no large amounts need be purchased in advance of deliveries to customers. We have included these amounts in operating costs, table 4. To the extent we are in error, our computations prejudice petitioner, not respondent.)

878

## Table 4

*Direct and Indirect Operating Costs Excluding Depreciation,*
*Amortization, and Disallowed Items*

(derived from Alles' operating statements and schedules)

|  | 1956 | 1957 |
|---|---|---|
| Productive labor | $ 355,450.03 | $ 278,235.18 |
| Manufacturing expenses | 433,291.07 | 392,723.64 |
| Revenue stamps | 354,796.02 | 345,433.68 |
| Selling and general expenses | 412,077.83 | 439,683.63 |
| Other charges, net | 9,495.48 | 13,259.91 |
| Total annual operating costs | $1,565,110.43 | $1,469,336.04 |
| Per day (365) | $ 4,288.00 | $ 4,026.00 |

*Adjustments to Operating Statements*

| | 1956 | | 1957 | |
|---|---|---|---|---|
| PRODUCTIVE LABOR | — | | — | |
| MANUFACTURING EXPENSES: | | | | |
| Operating statements | | $476,996.01 | | $441,717.64 |
| Less: | | | | |
| Depreciation, factory equipment | $29,338.27 | | $33,318.24 | |
| Amortization, licenses | 14,366.67 | 43,704.94 | 15,675.76 | 48,994.00 |
| | | $433,291.07 | | $392,723.64 |
| REVENUE STAMPS | — | | — | |
| SELLING AND GENERAL EXPENSES: | | | | |
| Operating Statements | | $429,197.83 | | $456,795.37 |
| Less: | | | | |
| Depreciation, automobiles | $15,967.80 | | $15,968.62 | |
| Depreciation, Florida real estate | 468.75 | | 468.76 | |
| Depreciation, office equipment | 683.45 | 17,120.00 | 674.36 | 17,111.74 |
| | | $412,077.83 | | $439,683.63 |

OTHER CHARGES, NET

| | | | |
|---|---|---|---|
| Operating statements | | 28,002.48 | $14,512.06 |
| Less: | | | |
| Pension, disallowed | $15,000.00 | | |
| Gain, sale of automobiles & equipment | (2,290.04) | | (4,744.77) |
| Depreciation: | | | |
| Buildings | 5,246.92 | | 5,246.92 |
| Equipment | 320.04 | | 320.05 |
| Massachusetts excise tax, disallowed | 230.08 | 18,507.00 | 429.95 | 1,252.15 |
| | | $ 9,495.48 | | $13,259.91 |

Table 5

*Relevant Daily Averages*

| | 1956 | 1957 |
|---|---|---|
| DAILY SALES: | | |
| Annual sales — net ............. | $2,979,061.52 | $2,812,873.24 |
| Average daily sales ........... | $ 8,161.00 | $ 7,706.00 |
| (annual sales ÷ 365) | | |
| DAILY COST OF MATERIALS: | | |
| Annual cost of materials ........ | $1,081,416.04 | $1,033,722.08 |
| Average cost per day ........... | $ 2,963.00 | $ 2,832.00 |
| (annual cost ÷ 365) | | |
| DAILY COST OF OPERATIONS: | | |
| Annual operating costs ......... | $1,565,110.43 | $1,469,336.04 |
| Average cost per day ........... | $ 4,288.00 | $ 4,026.00 |
| (annual costs ÷ 365) | | |