### C. E. HOOPER, INC.

v.

### The UNITED STATES.

No. 68–73.

United States Court of Claims.

July 9, 1976.

---

1. In 1974, section 308 was amended, subsection (e) became subsection (d).

James B. Lewis, New York City, atty. of record, for plaintiff. Selvyn Seidel and Paul, Weiss, Rifkind, Wharton & Garrison, New York City, of counsel.

Before DAVIS, NICHOLS and KUNZIG, Judges.

OPINION .

PER CURIAM:

This case comes before the court on the joint motion of the parties, filed March 18, 1976, moving that the court adopt, with modifications *, the recommended decision

---

* The modification requested by the parties is the deletion of footnote 1 of the trial judge's opinion relating to "burden of proof" which the parties assert is merely dicta and not an inte-gral part of the opinion since the issue was not raised nor briefed by the parties and not a basis for the trial judge's opinion. However, the

of Trial Judge Philip R. Miller, filed January 23, 1976, pursuant to Rule 134(h), as the basis for its judgment in this case. Upon consideration thereof, without oral argument, since the court agrees with the trial judge's recommended decision, as hereinafter set forth **, it hereby affirms and adopts the said decision, with a modification in footnote 1, as the basis for its judgment in this case. Therefore, it is concluded that the court has jurisdiction of this case and that plaintiff is entitled to recover. Accordingly, judgment is entered for plaintiff with the amount of recovery to be determined pursuant to Rule 131(c).

### OPINION OF TRIAL JUDGE

■ Miller, *Trial Judge:* Plaintiff sues for refund of income taxes it paid for its fiscal year ended March 31, 1966. Plaintiff incurred a loss for its 1969 fiscal year and claims the right to a loss carryback deduction for 1966. Defendant does not contest the loss carryback but asserts as a setoff defense with respect to the claimed refund that for the year 1966 plaintiff was availed of for the purpose of avoiding income tax on dividends to its stockholders and that accordingly plaintiff was liable for accumulated earnings tax for that year in an

amount equal to or greater than that sought by plaintiff.

Section 531 of the Internal Revenue Code of 1954 imposes a tax on the accumulated taxable income of a corporation formed or availed of for the purpose of avoiding the income tax with respect to its shareholders by permitting earnings and profits to accumulate instead of being divided or distributed. The accumulated taxable income is defined as the taxable income for the year with certain adjustments and deductions such as dividends paid, income taxes accrued and a credit for such part of the earnings and profits for the taxable year as are retained for the reasonable needs of the business. Section 533(a) provides that the fact that the earnings and profits are permitted to accumulate beyond the reasonable needs of the business shall be determinative of the purpose to avoid the income tax with respect to shareholders, unless the corporation by the preponderance of the evidence shall prove to the contrary.[1]

The statutory purpose has been simply stated (*Ivan Allen Co. v. United States*, 422 U.S. 617, 624–25, 95 S.Ct. 2501, 2505, 45 L.Ed.2d 435 (1975))—

Because of the disparity between the corporate tax rates and the higher grada-

court adopts footnote 1 with a modification of its own.

** Whereas the court adopts the trial judge's separate findings of fact, which are set forth in his report filed January 23, 1976, they are not printed herein since such facts as are necessary to the decision are contained in his opinion.

1. The posture in which this issue arises raises a problem with respect to burden of proof. Section 534 of the Code provides that if the taxpayer files with the Commissioner of Internal Revenue a statement of the grounds and facts upon which it relies to establish that all or part of its earnings and profits have not been permitted to accumulate beyond the reasonable needs of the business, or if the Commissioner fails to send the taxpayer a notification of his intention to issue a notice of accumulated earnings tax deficiency so that the taxpayer may have an opportunity to file the statement in a Tax Court proceeding to set aside the deficiency, the burden of proof as to the reasonableness of the accumulation shall be on the Commissioner. By raising the accumulated earn-

ings tax deficiency in its answer to the petition in this court as an offset to an otherwise refundable income tax (attributable to a loss carryback deduction) defendant has deprived the taxpayer of the notification, the right to file a statement and the right to go to the Tax Court where the Commissioner would have to assume the burden of proof on the reasonableness of the accumulation. It may well be therefore that under such circumstances the burden of proof would be imposed on the defendant. *Cf.* Internal Revenue Code § 7454 (relating to burden of proof of fraud in Tax Court) with *Armstrong v. United States*, 354 F.2d 274, 285, 173 Ct.Cl. 944, 962 (1965); and *see also Missouri Pacific R. R. v. United States*, 338 F.2d 668, 671–72, 168 Ct.Cl. 86, 91 (1964); and *Lykes Bros. S. S. Co. v. United States*, 459 F.2d 1393, 198 Ct.Cl. 312 (1972). However, since plaintiff neither raised nor briefed this issue and defendant was not put on notice of having such a burden of proof in this case, the decision herein has not been arrived at on such basis.

tions of the rates on individuals, a corporation may be utilized to reduce significantly its shareholders' overall tax liability by accumulating earnings beyond the reasonable needs of the business. * *

In order to foreclose this possibility of using the corporation as a means of avoiding the income tax on dividends to the shareholders, every revenue act since the adoption of the Sixteenth Amendment in 1913 has imposed a tax upon unnecessary accumulations of corporate earnings effected for the purpose of insulating shareholders. [Footnotes omitted.]

During the taxable year at issue plaintiff was engaged in the businesses of measurement of radio audiences and of performing market research on a custom basis by telephone interviews. Although plaintiff was incorporated in 1962, the business actually dates back to 1936 when it was commenced by C. E. Hooper, Inc. (Old Hooper), and it was in continuous operation since that time. After the death of the founder, in September 1962, seven employees of the company and its attorney invested $100,000 in a new company, the plaintiff, and the new company purchased all of the stock of Old Hooper from Mrs. C. E. Hooper and her daughter and liquidated it so as to acquire the assets. The consideration was approximately $800,000, of which $100,000 was in cash, $500,000 was in the form of a 6-year note signed by plaintiff and personally guaranteed by its eight stockholders, and the remainder consisted of some of the assets of the corporation which were turned over to Mrs. Hooper.

Plaintiff was prohibited from paying dividends until the note was paid off. However, from its inception plaintiff prospered and was able to pay off the note in less than half its term, by September 1965.

From the start the intent of the subscribers was that ownership of plaintiff remain in the hands of persons connected with the operations of the company. The 1962 stock-subscription agreement provided that any stockholder desiring to sell his shares was required first to offer them to the plaintiff and then to the other stockholders pro rata at a price which took into account the continuing share of indebtedness to Mrs. Hooper. After the note to Mrs. Hooper had been paid off, as of December 20, 1965, the parties revised and amplified their restrictive agreement on transfer of shares to outsiders so as to cover not only voluntary transfers but also transfers resulting from death, incompetency, insolvency, attachment, execution, etc. A stockholder desiring to dispose of his shares could require the corporation to purchase them at book value including goodwill; but if he obtained a bona fide purchase offer from an outsider which was more favorable he was required to give the corporation a first option and the other stockholders a second option to purchase either at the offer price or at a "Purchase Price Per Share", defined as the greater of (a) the average price paid per share and (b) seven times the prior average earnings, plus book value. In the event a stockholder ceased to be an employee, officer or director, or in the event of a threatened involuntary transfer, the plaintiff and its remaining stockholders were also given the same options to buy at the "Purchase Price Per Share". The price was to be paid one-sixth in cash and in five annual installments plus interest.

Subsequent to the taxable year at issue one of the employee-shareholders died, one retired and two others resigned to take positions elsewhere. Pursuant to the option agreement the corporation redeemed their shares as follows:

| Amt. Pd In For Shares | Redemption Price | Difference | Redemption Date |
|---|---|---|---|
| $10,500 | $91,389 | $80,889 | 3/31/67 (deceased) |
| 4,000 | 36,374 | 32,374 | 6/30/67 (retired) |
| 10,000 | 99,680 | 89,680 | 12/5/67 (resigned) |
| 7,500 | 78,297 | 70,797 | 5/31/68 (resigned) |
| $32,000 | $305,740 | $273,740 | |

The first redemption was paid in a lump sum, while the remainder was paid one-sixth in cash and the balance in five annual installments evidenced by notes.

In the performance of its services plaintiff employed a network of approximately 3,000 telephone interviewers working out of

their homes in from 350 to 400 market areas throughout the United States. Except for supervisors and a few key employees in each city who were paid a monthly retainer of from $20 to $25, the interviewers were paid for hours of actual interviewing work. At the nucleus of the Hooper organization plaintiff had about 145 salaried employees. Some of these were employed in the executive and sales offices in New York City. Others were situated at a production facility in Wilton, Connecticut, where information was collected, tabulated and put into report form.

In its radio-surveying business plaintiff prepared continuous measurement of in-home radio listeners on a market-by-market basis and sent them to subscribers to its reports. More than 97 percent of its subscribers were radio stations, and the remainder were advertising agencies and advertisers. Subscribers found them useful in program evaluation and planning, and for media buying. The Hooper-Ratings method employed a coincidental telephone survey to measure radio listening. The interviewers would inquire on the telephone as to whether the respondent's radio was turned on, and if the respondent or another member of the household was listening he was asked to identify the radio station and program. Plaintiff then prepared periodic reports on listening habits in each market.

Plaintiff's marketing research work involved determination of the attitudes of consumers with respect to particular products, and how most effectively to sell to such consumers. Each research project was tailor-made to the particular client and product. It frequently involved questionnaires and precisely instructed interviewing procedures. The information was tabulated, coded, processed and compiled into a report for the particular client paying for the project. Both aspects of the business involved utilization of the same network of telephone interviewers and markets.

The principal officers during the taxable year were Frank Stisser, its president, and Bruce McEwen, its executive vice president. Both had been in similar posts in Old Hooper.

A capsulized statement of plaintiff's earnings for the fiscal years ended March 31, 1963 through 1969, its dividends, and retained earnings may be set forth as follows:

| | 1963 (2 mos.) | 1964 | 1965 | 1966 | 1967 | 1968 | 1969 |
|---|---|---|---|---|---|---|---|
| Net Profit or Loss | $9,990 | $180,173 | $172,764 | $299,399 | $227,019 | $118,581 | ($58,372) |
| Dividends | | | | 50,000 | 30,000 | 7,595 | --------- |
| Net Profit or Loss to Retained Earnings | 9,990 | 180,173 | 172,764 | 249,399 | 197,019 | 110,986 | (58,372) |
| Charge to Earnings on Redemption of Stock | | | | | | 203,393 | 70,797 |
| Total Retained Earnings | $9,990 | $190,162 | $362,927 | $612,326 | $809,345 | $716,938 | $587,769 |

Since through March 31, 1966, the retained earnings were for the most part used to pay off the note to Mrs. Hooper, which had been used in the bootstraps purchase of the business of Old Hooper, plaintiff's net liquid assets or working capital was considerably below its retained earnings as of the end of each fiscal year. Such may be portrayed as follows:

| | Current Assets | Less Current Liabilities | = Net Liquid Assets (Working Capital) |
|---|---|---|---|
| 1963 | $305,959 | $163,068 | $142,891 |
| 1964 | 467,379 | 293,639 | 173,740 |
| 1965 | 439,426 | 237,481 | 201,945 |
| 1966 | 659,164 | 353,782 | 305,382 |
| 1967 | 702,618 | 195,137 | 507,481 |
| 1968 | 629,860 | 116,210 | 513,650 |

From the foregoing tabulations and other financial evidence in the record various inferences may be drawn. For its fiscal year ended March 31, 1966, plaintiff's after-tax net income, $299,399, was more than 70 percent higher than in the prior year. Its operating profit for the last month of the 1966 fiscal year was 47 percent higher than the average monthly earnings for the prior 11 months. Even after payment of its first dividend, $50,000 in 1966, its books still showed $305,382 in liquid assets. Thus the financial results through fiscal 1966 show prosperous conditions and no basis for apprehension as to prospect of losses necessitating the husbanding of liquid reserves. Even for the year after the one in issue the financial statistics do not reflect a declining business. While fiscal 1967 net earnings of $227,019 were 24 percent less than in 1966, they were still higher than in any prior year, and there was no evidence of any substantial decline in its revenues, since the gross income was short of its peak by only 7 percent and net liquid assets at the end of fiscal 1967, after a $30,000 dividend, still increased to $507,481.

Plaintiff claims that the $305,382 was far less than the reserves a prudent business corporation required for its reasonable needs, both present and anticipated as of March 31, 1966. It enumerates requirements for working capital and a variety of plans and contingencies requiring the expenditure of capital. Defendant on the other hand can find a need for no more than $192,000 in working capital and deems the remainder of the $305,382 to be beyond the reasonable needs of the business.

Plaintiff claims working capital requirements as of March 31, 1966, to be $439,323. As noted above defendant's comparable figure is less than $192,000. On the basis of the evidence and as more fully set forth in the findings, it is concluded that plaintiff's working capital needs as of the end of fiscal 1966 were $241,144.

An approximate method for determining working capital requirements based on the needs for one complete operating cycle of a business has evolved from decisions during the last 10 years beginning with *Bardahl Manufacturing Corp. v. Commissioner,* 24 TCM 1030 (1965). And *see also Apollo Industries, Inc. v. Commissioner,* 358 F.2d 867, 871–72 (1st Cir. 1966); *Kingsbury Investments, Inc. v. Commissioner,* 28 TCM 1082, 1088–89 (1969); and *W. L. Mead, Inc. v. Commissioner,* P–H Mem.T.C. ¶ 75,215 (1975). A synopsis of the method is set forth in B. Bittker and J. Eustice, Federal Income Taxation of Corporations and Shareholders 8–16 (3rd ed. 1971), as follows:

> The operating-cycle test, first enunciated by the Tax Court in the *Bardahl* case in 1965 and refined by later decisions, permits accumulations of current earnings to cover reasonably anticipated costs of operating a business for a single operating cycle. The length of the cycle is the period during which money is tied up in inventory or accounts receivable, and hence is unavailable for dividend distributions by the company. This cycle may be described as the time needed to convert cash into raw materials, raw materials into finished goods, inventory into sales and accounts receivable, and any accounts receivable into cash.

As Bittker and Eustice also recognize, authorities subsequent to *Bardahl* have included in the operating cycle as a factor to be subtracted in determining the taxpayer's operating capital requirements the time extended to it by its own creditors, since to the extent that payment of expenses may be postponed as a result of credit arrangements plaintiff's need for operating capital is reduced. *See Kingsbury Investments, Inc. v. Commissioner, supra,* and *W. L. Mead, Inc. v. Commissioner, supra.*

Although plaintiff did not have inventories in the conventional sense, the time required for production of its reports prior to billing may fairly be compared to the production of inventory. For its 1966 fiscal year approximately two-thirds of plaintiff's business (as measured by gross revenue) [2]

2. Plaintiff urges that the business be divided up according to costs of operation. However, the record does not fairly enable the making of such a division.

was comprised of its marketing research business. This had an average production period of approximately 45 days. The remaining one-third of plaintiff's business, the radio-survey business, was billed on the first of each month without regard to whether the work was completed or even begun. Defendant takes the view that on the average the radio work was prepaid to the extent of 10 days. On the basis of the record it cannot be told whether such work was predominantly prepaid or whether plaintiff generally used its own working capital to pay for the work during the period of its production. Accordingly, it can only be determined that on the average plaintiff required zero days of working capital for preparing the radio surveys during the production cycle. On the basis of these facts it is concluded that plaintiff's average production cycle for the combined marketing-research business and radio-survey business was approximately 30 days.

The parties are in agreement that the average time between plaintiff's posting an account receivable on its books to its collection of that account receivable (plaintiff's collection cycle) was 43.53 days.

In appraising plaintiff's own credit cycle, its expenses must be divided into three different categories: Interviewers' Salaries, Other Salaries, and Nonsalary Payables. Interviewers were paid once a month. Other salaries were paid twice a month. For the fiscal year 1966, 63.5 percent of plaintiff's expenses were for salaries. Of these approximately 28 percent were for salaries paid every 30 days, and 35.5 percent were for salaries paid every 15 days. The remaining 36.5 percent of plaintiff's expenses, for other than salary purposes, were determined by the Internal Revenue agent on the basis of his conversations with plaintiff's representatives to have a credit cycle of about 30 days. Plaintiff has not presented any evidence to contradict such determination. The net effect of the three credit periods is to attribute to plaintiff an average credit cycle for all payables of 24.7 days.

In summary, based upon plaintiff's having for its fiscal year ended March 31, 1966, a production cycle of 30 days, plus a collection cycle of 43.53 days, less a credit cycle of 24.7 days, it is reasonable to conclude that plaintiff had an operating cycle of approximately 48.83 days. Since plaintiff's operating expenses for the same fiscal year totaled $1,802,526, or an average of $4,938.43 per day, the amount of working capital required by plaintiff for its operating cycle of 48.83 days comes out to $241,144.

Plaintiff also claims various specific needs for its earnings as of the end of the taxable year at issue. The major difficulty in evaluating these claims is that the witnesses' recollections as to particular dates and periods of time tend to telescope. This is exacerbated by the fact that plaintiff's fiscal year ended March 31, 1966, terminated so early in the calendar year and they sometimes tended to use "1966" interchangeably. With respect to most of the items it is difficult to tell whether President Stisser and Executive Vice President McEwen were testifying with respect to their intentions, actions and discussions as of the end of fiscal 1966, or as of periods one and two years later. The difficulty is compounded by the fact that the business continued to improve through the end of fiscal 1966, so that the impending downturn was not apparent to plaintiff's management and they found no need to make definite or specific plans to improve their operations and reverse the decline by making additional capital expenditures until well after the termination of the fiscal year.

A substantially contemporaneous view of the business is obtainable not only from the financial statistics for fiscal 1966, but also from a report and analysis made by Executive Vice President McEwen to the board of directors meeting on December 16, 1965, about 3 months before the end of the fiscal year. In it he noted that the company's image continued to be excellent, its client list was wide and blue chip, its marketing-research business continued to grow, its reputation was enhanced, its sales efforts

were almost nonexistent because its orders were in excess of its ability to handle them, and he also projected that, "Assuming continued good general business conditions, the outlook for the marketing research division of our company is very bright." On the other hand he noted some problem areas. Included among these was the fact that the company was unable to handle any additional business because its production facility at Wilton, Connecticut, which tabulated the information received from the interviewing field personnel and prepared the reports, was inconveniently located at an excessive distance from New York City, so that experienced marketing research, tabulating and other competent personnel it sought to recruit did not wish to live and/or work there. To meet this need he recommended to the board consideration of the retention of some profits looking to the purchase of a small marketing research tabulation operation in New York, while retaining the experienced personnel already established and living in Wilton or nearby. He also reported a high turnover in interviewing personnel, causing the quality of the field work to deteriorate and increasing the cost of training new interviewers. For this he recommended greater time, effort and expense to be put into training, control, discipline and morale of field workers. He recommended that such steps were necessary to continue the company's dominance of the telephone-interviewing technique, or else it would be faced with serious competition.

The minutes of the December 16, 1965 board of directors meeting indicates some discussion of McEwen's report, but does not indicate that any particular action was taken thereon by the board.

Plaintiff claims that as of March 31, 1966, it had a business need for $30,000 to $40,000 to be spent to strengthen its interviewer personnel in the fields, as recommended in McEwen's report. Although the evidence shows that during the summer of 1966 plaintiff paid for 10 to 15 regional supervisors located throughout the country to come to Wilton for a week of training sessions,

there is no reliable evidence as to the cost of such sessions or as to the extent to which they exceeded plaintiff's customary training and orientation costs covered by its usual overhead. Plaintiff's account entitled "Field Staff Travel" totaled $15,901 for its entire 1967 fiscal year, but this was actually $8,000 less than for the prior year. Therefore, it cannot be concluded that plaintiff had a need for the accumulation of earning reserves for such purpose as of the end of fiscal 1966.

Plaintiff claims that as of the end of fiscal 1966 it approved a $200,000 expenditure to purchase a small market research tabulating company as recommended in Mr. McEwen's report. However, nothing in the minutes indicates approval of any such plan or amount. McEwen himself testified that he knew of only two feasible prospects for purchase, that he had checked into them by the fall of 1965 and found that the first was not of sufficient quality to merit purchase, and that the owner of the second was unwilling to sell the company. Thereafter he was of the view that if the company wanted to obtain additional tabulating personnel and facilities it would have to establish them itself. Accordingly, it must be concluded that as of the end of fiscal 1966 plaintiff had no definite or specific plans to buy an independent market research tabulating company as plaintiff now claims. There is also no evidence of specific or definite plans of any sort to make capital expenditures for such a new facility.

Plaintiff asserts a need in an unspecified amount for funds to purchase the building it rented for its production personnel in Wilton, Connecticut, in order to assure retention of its trained personnel who lived in the Wilton area, and to eliminate its continuing difficulties with its landlord. The minutes of the March 5, 1966 directors meeting does record a resolution authorizing the president "to make inquiry * * * of the availability of said premises for purchase * * *." However, other evidence in the record indicates that the management of the corporation had not really made up its mind to make such a purchase.

President Stisser testified that the Wilton premises were unsatisfactory because they were too far from plaintiff's New York City sales and executive offices and it took too much time to travel between the two, because it was difficult to recruit any additional personnel to work in Wilton, and because it was overcrowded and in violation of the town's zoning laws. Nine months later, at the December 1966 meeting of the board, Stisser reported that his negotiations had been unsuccessful because the owner had demanded an excessive $600,000 price. But even after the landlord had reduced his asking price to $250,000 or $300,000 and offered to lease back the basement at up to $5,000 per year, in March 1968 plaintiff still had not decided to make any such purchase. Plaintiff renewed its lease of the Wilton facility until January 1969 when finally the corporation moved its production facilities from Wilton to Norwalk, Connecticut, after three of its shareholders acquired a new building for $300,000 and leased it to plaintiff subject to an expenditure by plaintiff of $150,000 for improvements. Thus, the record does not support any finding that there was any specific plan during fiscal 1966 for the corporation to acquire the Wilton building.

Plaintiff asserts that one of its reasonable needs was the accumulation of funds to change over its method of surveying radio audiences from home-audience measurement to complete-audience measurement. During calendar years 1967 and 1968 plaintiff spent about $520,000 for such purpose. This involved $250,000 for computers and related equipment and for computer programming, $208,000 in salaries and other expenses for additional research and development personnel, increased sales force, office and computer personnel, and $60,000 for additional office equipment. But to what extent did plaintiff contemplate such expenditures and how specific and definite were its plans for them in March 1966?

As already noted, plaintiff's method for radio-audience measurement was the "telephone concidental" technique whereby an interviewer would telephone listeners in their homes and ask them as to what if any programs they and others in their homes were listening to at that time and to identify them. While the results were very accurate, it had the weakness that it only measured home listening and did not measure auto radio and portable radio audiences. With the development of transistor radios particularly, the away-from-home audience increased as a percentage of the total. A 1965 publication by a leading advertising agency, which was also a client of plaintiff, estimated that the distribution of radio listening by location was 68 percent in the home, 21 percent in automobiles and 11 percent elsewhere. A vice president of the advertising agency repeatedly cautioned Hooper's President Stisser that plaintiff would have to expand its telephone interviews to measure total radio audience in and out of the home or else lose out to its competitors. Some of plaintiff's other clients also informed it during 1965 and 1966 that they would no longer be able to justify purchasing Hooper's survey unless it made drastic changes in its method so as to enable coverage of the total market.

Plaintiff had two significant competitors in the radio field, Pulse, Inc., and American Research Bureau (ARB). Pulse had been a competitor of long standing and ARB entered the field in 1965 after having been in the television-audience measuring field. Pulse used a "roster recall" method under which an interviewer personally visited the homes of the interviewees, showed them a roster of the programs of a particular day and asked them to provide information as to the programs to which they had listened. ARB used a "diary" method under which a listener would be given a diary and asked to keep it with him and record information concerning the programs to which he listened. While plaintiff was aware of the expanded radio market and the methods used by its competitors, as well as the possibility or probability that eventually it would have to do something to enable it to meet the competition, from all of the evidence it must be concluded that during that fiscal year plaintiff had not definitely decided as to whether or not and when it

would change its method of interviewing from the coincidental telephone method to a total audience method, and had no specific plans for spending any substantial sums of money for that purpose. Plaintiff (and its predecessor) had had experience over the years in attempting to measure total radio audiences and was not convinced that the value of the expansion outweighed the decrease in accuracy. It found that the greater demand for the change came from the advertising agencies and their clients, while more than 97 percent of plaintiff's customers were radio stations. Plaintiff was satisfied that the radio stations still believed that plaintiff's partial radio surveys were a more accurate aid in audience measurement and in programming than the other methods, and in any event could be used in conjunction therewith. Radio stations purchasing Pulse's services also continued to buy Hooper's surveys. While ARB began to receive attention in the trade, as of March 1966 ARB was only engaged in surveying 15 to 30 markets, while plaintiff and its staff of interviewers covered 350 to 400 markets throughout the United States. Hooper also felt that there was a substantial economic difference in favor of the Hooper method in that the Hooper surveys cost the radio stations $250 a month, while a typical ARB survey cost the client $4,000 to $5,000 each. Finally, what was most persuasive to Hooper's President Stisser that there was no immediate need to change its method of radio-audience surveying in favor of a more expensive method which would also be more costly to its customers was the fact that Hooper's income from its radio-surveying business continued to expand sharply in 1966. As Stisser put it, "We were also growing. We were very happy being the managing [*sic*, probably "measuring"] and programming tool. That a fine business for us at that point. There was no need to change really." Indeed, plaintiff's radio-measurement business not only continued to increase through fiscal 1966 but to plaintiff's management it appeared to continue to hold up during most of the following year and, as Stisser further testified, the decline which took place in the

number of plaintiff's customers "wasn't obvious until December of '66."

From the foregoing it is evident that during fiscal 1966 plaintiff had no specific or definite plans for any change in its method of radio-audience measuring which would necessitate the expenditure or accumulation of funds for future expenditure, but it also gave attention to the possibility that at some time in the future it would eventually have to make changes in its radio-audience measurement techniques which might or would necessitate substantial expenditures. As previously noted, from 2 to 3 years later it actually spent more than one-half million dollars for such purpose.

Another claimed business need was for $300,000 to improve plaintiff's marketing-research business by procuring centralized and supervised telephone interviewing quarters for its field staff in up to 10 different cities. Like its radio-audience measuring business plaintiff's marketing-research business expanded greatly from 1963 through 1966. Its fiscal 1966 gross income from that part of its business increased by 13 percent over 1965. Mr. McEwen's report to the board of directors on December 16, 1965, made three-fourths of the way through the 1966 fiscal year, stated that most of plaintiff's orders were being received without having to engage in any sales effort. While 1967 was not equally good, the decline was only 8 percent from that peak year.

Beginning even prior to fiscal 1966 some of plaintiff's competitors in the market research-business had instituted centralized interviewing, a method whereby the telephone interviewers came to a central location and conducted their interviews under supervision, monitoring and control. In the view of the advocates of this method, although it was more costly, it offered the important advantages of greater accuracy, supervision and checking on the interviewers in the asking of sophisticated and complicated questions, and it appealed to clients who wanted to listen to the questions and answers so that they could get greater

understanding of the results. A number of plaintiff's marketing-research customers also expressed interest in having their research done in this manner.

However, the matter was not new to Hooper. In 1964 it had experimentally conducted two simultaneous surveys in a single city, Indianapolis, one with the telephone interviewers at home and the other with centralized interviewing. Although it found the latter to be much more expensive, it found the results nevertheless to be the same. Plaintiff believed that the cost would be too prohibitive for the method to be economically feasible. Interviewers operating from their homes were paid only for work done and their overhead costs were minimal. Plaintiff estimated that the capital cost of setting up central facilities would be as much as $30,000 per location in each market. Moreover, there would be increased wages, continuing overhead, costs for rent, maintenance and additional supervisors, plus compensated travel time for the interviewers from their homes to the central location. It was completely unfeasible to contemplate the institution of such a system in all 350 to 400 different markets in which plaintiff had interviewers. While Mr. McEwen believed it possible to institute centralized interviewing for a minimum of 10 medium-sized cities at a $300,000 commitment, at least through the fiscal year at issue plaintiff never made any decision to do so, since, as Mr. McEwen explained, "it was a limited field for customers because of the much higher cost. Many * * * were not willing to pay the higher cost of centralized interviewing and were happy to go along with the existing system," and it was "an open question * * * whether there would have been enough business at the higher prices necessitated by the centralized location to make it a profitable operation." Finally, he found, even the customers who were interested would not commit themselves in advance to support it financially.

The first time plaintiff actually seriously considered spending the money required for central interviewing in a minimum of 10 cities was after the close of its fiscal year 1966. A major client, Lever Brothers, found erratic results and inconsistencies among different Hooper surveys covering the same subject matter. After discussing the matters among themselves, Lever Brothers officials considered with Hooper personnel various alternative explanations, including the possibility that the quality of the interviewing might be at fault. Finally, no earlier than June 1966 Lever pinned the blame on the quality of the interviewing and concluded that for its needs supervised centralized interviewing was desirable. Plaintiff proposed to Lever Brothers setting up the centralized interviewing facilities in 10 medium-sized cities at the $300,000 cost over a 3-year period if Lever would make a financial contribution to it. However, Lever declined to subsidize the start-up costs of such a program and the matter continued under negotiation to December 1966. In March 1967, plaintiff's intentions appearing still to be ambivalent as to whether it wanted to undertake the change, Lever Brothers transferred its business to a competitor of plaintiff which was willing to set up the centralized interviewing facilities at its own initial outlay. Plaintiff did not thereafter set up such facility for any of its marketing-research clients. Under the circumstances it must be concluded that during the year in issue plaintiff had no specific or definite plans for investing in centralized interviewing facilities, nor did it set aside or accumulate funds for such a purpose.

Finally, plaintiff claims that during fiscal 1966 it decided to attempt to purchase a radio station in order to diversify its business, However, plaintiff's president conceded at trial that he first began investigating such a purchase several months after the end of the 1966 fiscal year and did not request the board of directors' approval to look into such an acquisition until December 1966, almost 9 months after the end of the fiscal year. Plaintiff never in fact attempted to make any such acquisition.

Having examined all of the claims for specific and definite plans and found them

wanting, nevertheless, it cannot be concluded that the 1966 accumulation was sufficiently beyond the needs of the business as to give rise to the statutory presumption of a tax avoidance purpose.

■ Plaintiff's accumulated earnings and profits as of the end of fiscal 1966 were $612,326. To the extent that they had been used to acquire the assets employed in the business (by paying off the original debt therefor), such earnings may not be deemed beyond the reasonable needs of the business. *Ivan Allen Co. v. United States,* 422 U.S. 617, 628, 95 S.Ct. 2501, 45 L.Ed.2d 435 (1975); *Electric Regulator Corp. v. Commissioner,* 336 F.2d 339, 344 (2d Cir. 1964). Plaintiff's remaining earnings, held in the form of liquid assets, were $305,382. Since it has been determined that plaintiff's working capital needs as of the same date were about $241,144, it retained only $64,238 in earnings in excess of its then current needs for working capital.

Plaintiff of course contends that a sum vastly in excess of the $64,238 was needed in the business for the various purposes already discussed. Defendant argues that even to the extent the asserted needs are borne out by the record they do not qualify under the statute as "reasonable needs of the business" because the anticipated uses were not sufficiently specific nor definite during fiscal 1966.

The statutory sections are drawn in general language. Section 533 provides:

*(a) Unreasonable accumulation determinative of purpose.*—For purposes of section 532, the fact that the earnings and profits of a corporation are permitted to accumulate beyond the reasonable needs of the business shall be determinative of the purpose to avoid the income tax with respect to shareholders, unless the corporation by the preponderance of the evidence shall prove to the contrary.

For the year at issue section 537 states:

For purposes of this part, the term "reasonable needs of the business" includes the reasonably anticipated needs of the business.

Congress added the section 537 expansion of the preexisting language of section 533(a) in the enactment of the 1954 Code. Its committee reports stated (H.Rep.No. 1337, 83d Cong., 2d Sess., A173, and S.Rep. No.1622, 83d Cong., 2d Sess., 318, 3 U.S.C. Cong. & Admin.News 1954, pp. 4017, 4312, 4621, 4701):

\* \* \* It is intended that this provision will make clear that there is no requirement that the accumulated earnings and profits be invested immediately in the business so long as there is an indication that future needs of the business require such accumulation. In any case where there exists a definite plan for the investment of earnings and profits, such corporation need not necessarily consummate these plans in a relatively short period after the close of the taxable year. However, where the future needs of the business are uncertain or vague, or the plans for the future use of the accumulations are indefinite, the amendment does not prevent application of the accumulated earnings tax.

Defendant infers from the language of these committee reports that there is in all circumstances a requirement of specificity and definiteness of plans for use of the funds and that it excludes even reasonable accumulations to meet reasonable contingencies. Such a view ignores the context of the committee reports. The restrictive language was not written to explain a loophole-closing measure but a provision which mitigated the severity of the preexisting statutory restrictions. The committees apparently felt a need to make it clear that in applying the new provision which opened the door in favor of taxpayers to a greater degree than previously they did not mean to leave it so wide open as to give taxpayers an avenue of escape from proper application of the tax by mere subjective statements of anticipated needs which cannot be corroborated objectively, and by fanciful schemes. This cautionary language with respect to a liberalization of the statute should not be raised to the level of a statutory amendment further restricting it. Had Congress intended to impose a specific-

ity requirement in plans for the future expenditure of accumulated earnings it required little draftsmanship effort to add such language to section 533 or 537.

The Treasury Regulations do not adopt without qualification the rigid approach urged on us by defendant. While section 1.537–1(b) tracks the quoted language of the committee reports, section 1.537–1(a) also states:

> * * * An accumulation of the earnings and profits (including the undistributed earnings and profits of prior years) is in excess of the reasonable needs of the business if it exceeds the amount that a prudent businessman would consider appropriate for the present business purposes and for the reasonably anticipated future needs of the business. * * *

■ In applying the standards for determining whether or not the accumulations are beyond "the reasonable needs" and "the reasonably anticipated future needs" of the business, we should not ignore the fact that this in itself does not trigger the tax, but is only used as the basis for a rational presumption of "the purpose to avoid the income tax with respect to shareholders" (sec. 533). As Judge Learned Hand stated (concurring) in *Casey v. Commissioner,* 267 F.2d 26, 32 (2d Cir. 1959):

> Section 532(a) was a penal statute, designed to defeat any plan to evade the shareholders' taxes, and there can be no doubt that it presupposes some deliberate purpose to do so and is not satisfied by proving that the corporation was mistaken in its estimate of its future "needs."

And *see also United Business Corp. v. Commissioner,* 62 F.2d 754, 755 (2d Cir.), *cert. denied,* 290 U.S. 635, 54 S.Ct. 53, 78 L.Ed. 552 (1933). It would therefore be inconsistent with the statutory scheme to adopt a test of reasonableness which in the particular case does not help resolve the ultimate inquiry as to purpose. If the fact finder is reasonably assured that a particular accumulation is in an amount that "a prudent businessman would consider appropriate" to overcome various business hazards and contingencies which are partially visible on the

horizon, it is difficult to see why the statute should be construed to require the court nevertheless to draw the inference that the corporation was motivated by the purpose of avoiding income tax on its shareholders because plans for use of the accumulation were not yet specific or definite. As the court stated in *Electric Regulator Corp. v. Commissioner, supra,* at 346:

> Nor is it always possible for a company in advance to set aside a specific sum to achieve a specific goal. Comments made in the past to the effect that a definite plan actually followed through must be on the company's books and records before moneys assigned thereto become anticipated needs may have to be appropriately qualified in particular cases.

■ Legislative committee reports are ordinarily strong evidence of congressional intent, but they should be read in proper context, and in appropriate cases they do not preclude the placing of greater weight on more persuasive evidence of the statutory purpose as a whole. *Commissioner v. Acker,* 361 U.S. 87, 92–93, 80 S.Ct. 144, 4 L.Ed.2d 127 (1959); *United States v. Ogilvie Hardware Co.,* 330 U.S. 709, 718–19, 67 S.Ct. 997, 91 L.Ed. 1192 (1947).

In the instant case we are required to evaluate the need for $64,238. This is a relatively small amount. It represents about 10 percent of accumulated earnings, 21 percent of net liquid assets, and about 4 percent of expenses for 1966.

An important point to keep in mind is that plaintiff's business was of a kind which could not reasonably be expected to remain at a fixed level without changes or improvements. Its products were not tangible but were intellectual efforts. What it offered to its clients were statistical compilations from relatively small samples of what it hoped were representative of yesterday's public habits, conduct, attitudes and opinions, and from which its clients could be reasonably satisfied they could attempt to forecast tomorrow's probabilities. The skills and arts involved were constantly subject to innovative ideas and improvements, and the competitor which could con-

vince the clients that its methods could achieve greater accuracy at an economically feasible cost represented a constant threat. While it would be reasonable to demand evidence of specific commitment to a particular use to support an accumulation of several hundred thousand dollars, considerably less specificity should be demanded for $64,-238, which at best gives only a measure of room to experiment and maneuver. A prudent businessman in such an enterprise could be expected to retain at least that sum for such purposes.

The allowance of reserves for unexpected demands and unanticipated emergencies in general would blunt the edge of the accumulated earnings tax and frustrate its purpose. However, "a contingency is a reasonable need for which a business may provide if the likelihood of its occurrence reasonably appears to a prudent businessman." *Dahlem Foundation, Inc. v. United States,* 405 F.2d 993, 1003 (6th Cir. 1968); *Smoot Sand & Gravel Corp. v. Commissioner,* 241 F.2d 197, 206 (4th Cir.), *cert. denied,* 354 U.S. 922, 77 S.Ct. 1383, 1 L.Ed.2d 1437 (1957); *Duke Laboratories, Inc. v. United States,* 222 F.Supp. 400, 412 (D.Conn.1963), *aff'd* 337 F.2d 280 (2d Cir. 1964).

The evidence reflects plaintiff's reluctance during fiscal 1966 to expand its radio surveys beyond the home audience while its earnings continued to rise; but in the light of the increasing proportion of away-from-home listeners a prudent businessman in plaintiff's position would nevertheless not have disregarded the probable need for retaining some resources in the coming years to accommodate itself to the changing market. In its brief defendant concedes that "there certainly was an impetus in fiscal year 1966 for radio-listening surveyors to gather information from the total audience market." Plaintiff's need for the accumulation is corroborated by its expenditures during the next 2 to 3 years of more than a half million dollars to enable it to provide a total radio-audience measurement service by the fall of 1968. Plaintiff did not resolve its doubts about incurring such expenditures during 1966, but the problem did not arise spontaneously thereafter. Had plaintiff not accumulated some reserves in prior years, it might have had difficulty in implementing its decision in 1968.[3]

While plaintiff never adopted centralized interviewing for its market-research business and did not have a definite plan to adopt it, the evidence does show that during or even prior to fiscal 1966 some of its clients requested it. Plaintiff did evaluate its feasibility and it did make cost estimates involving a minimum of $300,000. Without a minimal reserve plaintiff could not even have considered the proposals seriously.

Again, while the record reflects that during fiscal 1966 plaintiff had no firm plan for purchasing particular real estate, it does show that plaintiff gave consideration to the alternatives of either the unsatisfactory building at Wilton, Connecticut, in order to insure retaining the corps of trained workers who lived there, or to buying other quarters closer to New York where additional skilled workers could be recruited. Although plaintiff did not arrive at a specific plan to do either during the year, the fact is that eventually plaintiff had to do one or the other. In January 1969 its shareholders acquired the new building in Norwalk, Connecticut, for $300,000 and plaintiff had to put out $150,000 for improvements. Therefore, even in the absence of a definite use for a specific amount of funds, it may reasonably be concluded that a prudent businessman in plaintiff's position would have retained at least $64,-238 to enable it to undertake one or the other of these steps should the opportunity for a favorable purchase present itself.

The record also shows a preexisting policy that ownership and control of the business should, if possible, be confined to those who managed it, and therefore stockholders and the estates of decedent stockholders were required to give the corporation first

---

3. Treas.Reg. § 1.537–1(b)(2) states that, "subsequent events may be considered to determine whether the taxpayer actually intended to con-

summate * * * the plans for which the earnings and profits were accumulated."

option on the purchase of their shares. Since during 1966 at least the agreed option prices were at book values in excess of the amounts paid in, maintenance of such a policy dictated the retention of some earnings for this purpose lest the corporation be required to go heavily into debt. Within 1 year of the close of fiscal 1966 one minority officer-stockholder died and the corporation paid her estate $91,389 in cash, of which $80,889 necessarily came from earnings. Over a period of 26 months after fiscal 1966, plaintiff paid in cash and notes $214,-351 in redemption of the shares of three retiring and resigning officers, of which $192,851 was chargeable to earnings. It is difficult to surmise that a reserve of at least $64,238 was in excess of what a prudent businessman would retain to enable it to carry out its agreed policy.[4]

In the light of these various alternative and combined contingencies peculiar to plaintiff's business and its ownership, it is concluded herein that a prudent businessman would have considered it appropriate to accumulate aggregate earnings to meet them at least equal to the $64,238 at issue.

Finally, it is concluded that plaintiff was not availed of for the purpose of avoiding the income tax with respect to its shareholders.[5] Former President Stisser and Executive Vice President McEwen, who held the controlling interests in plaintiff, testified directly that in deciding the amount of dividends to disburse and the amount of earnings to retain for fiscal 1966 they were not motivated by any intent to avoid surtaxes. Plaintiff having been merged with a publicly held company in fiscal 1970, neither is presently employed by plaintiff or its present owner and his interest in the result of this case is relatively small, as a small minority stockholder. There was no cross examination with respect to their tax motivation in retaining the $64,238 in the business, and there is no testimony of minority stockholders or others to contradict them.

Their actions in disbursing $50,000 in dividends during fiscal 1966 and $30,000 in 1967 is certainly to some degree inconsistent with the intent to avoid surtax on themselves. Any such withholding of additional earnings for personal reasons would have been incompatible with the interests of the minority employee-stockholders owning 45.45 percent of the shares, who, judging from their salaries of from $15,250 to $24,500 were not so affluent as not to need additional income. Both Stisser and McEwen testified that they were under pressure from the minority stockholder-coworkers to pay additional dividends, and had they felt the business interests warranted it they would have voted to do so.

Had Stisser and McEwen been motivated in their corporate financial decisions by personal considerations, it is more likely they would have increased their salaries which were relatively small for a business earning almost $300,000 after taxes ($34,000 plus $5,100 in deferred compensation under profit-sharing plan for Stisser, and $31,500 plus $4,725 for McEwen), and which would have been deductible by the corporation in computing both income and accumulated earnings taxes.

Defendant argues that since Stisser's and McEwen's total incomes put them into the 50 and 42 percent surtax brackets in 1966, they avoided surtax by not receiving any additional dividend income at that time. (Had they distributed the entire $64,238, Stisser would have received $24,700 and McEwen $15,417.) However, the argument based on such surtax brackets is not persuasive as to their purpose. It disregards wholly the risks and disadvantages of such a course of conduct. It presupposes that in 1966 they had plans for liquidating the cor-

---

4. Accumulations for such purposes have been held to serve a business need. *Mountain State Steel Foundries, Inc. v. Commissioner,* 284 F.2d 737, 743–45 (4th Cir. 1960); *Farmers and Merchants Investment Co. v. Commissioner,* 29 TCM 705, 711 (1970).

5. This conclusionary finding is supported by all the evidence, even if arguendo defendant is aided by the presumption under Internal Revenue Code § 533(a) because of the absence of definite and specific plans for use of the accumulated liquid funds. *Cf. Halby Chemical Co. v. United States,* 180 Ct.Cl. 584, 599 (1967).

poration or selling their stock in the reasonably near future so that they could obtain the earnings at capital-gain rates without exposing them to possible future business losses and without interest for the intervening period. There is no evidence of any such plan. Such a tax-saving scheme would also have had to take into account the offsetting losses of their future salaries. Furthermore, the risk of accumulated earnings taxes at 27½ and 38½ percent, the cost of possible tax litigation, and the possibility of personal liability to the corporation in a suit against them by the minority stockholders for having caused the corporation to incur an unnecessary penalty tax for their personal benefit would also have to be thrown into the balance.

For all of the foregoing reasons it is concluded that the accumulated earnings tax was not due from plaintiff for its fiscal year ended March 31, 1966, and accordingly plaintiff is entitled to the refund properly attributable to its loss-carryback deduction from 1969.

## CONCLUSION OF LAW

Upon the findings of fact and the foregoing opinion, which are adopted by the court and made a part of the judgment herein, the court concludes as a matter of law that the court has jurisdiction of this case and that plaintiff is entitled to judgment. The amount of its recovery will be determined in further proceedings pursuant to Rule 131(c).