STATE OFFICE SUPPLY, INC. (FORMERLY J. W. CURTIN COMPANY), Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
State Office Supply, Inc. v. Commissioner
Docket No. 6886-80.
United States Tax Court
T.C. Memo 1982-292; 1982 Tax Ct. Memo LEXIS 450; 43 T.C.M. (CCH) 1481; T.C.M. (RIA) 82292; May 26, 1982. Donald O. Hughes (an officer), for the petitioner. Robert J. Kastl, for the respondent. SCOTT MEMORANDUM FINDINGS OF FACT AND OPINION SCOTT, Judge: Respondent determined deficiencies in petitioner's Federal income taxes in the amounts of $ 1,774 and $ 11,622 for the taxable years ending August 31, 1973, and August 31, 1975, respectively. The issues for decision are: (1) whether petitioner was availed of during the year ending August 31, 1975, for the purpose of avoiding Federal income tax with respect to its shareholders, by permitting its earnings and profits to accumulate instead of being distributed, within the meaning of section 532; [1] and (2) whether petitioner correctly computed its addition to its reserve for bad debts in each of the taxable years ending August 31, 1975, and August 31, 1976. [2]
*453 FINDINGS OF FACT Some of the facts have been stipulated and are found accordingly. Petitioner, State Office Supply, Inc. (State Office), is a corporation which had at the time of the filing of its petition in this case an office and principal place of business in Columbus, Ohio. During the years here in issue, petitioner operated under the name of J.W. Curtin Company. Petitioner was organized under the laws of the State of Ohio on October 9, 1947, and filed its Federal corporate income tax returns for the taxable years ending August 31, 1973, August 31, 1975, and August 31, 1976, with the Internal Revenue Service Center, Covington, Kentucky. State Office was and remains in the business of office design and the furnishing of office equipment and supplies. During the years in issue, the total sales of the company were made up of about 80 percent from equipment and 20 percent from supplies. Until the close of the corporation's year ending August 31, 1975, John W. Curtin was the president and treasurer of petitioner. He was also the majority stockholder. Petitioner was an accrual basis taxpayer and had adopted a fiscal year ending August 31. By letter dated November 15, 1979, State *454 Office was notified by respondent that a proposed statutory notice of deficiency for its taxable year ending August 31, 1975, included an accumulated earnings tax imposed under section 531. Petitioner, pursuant to the provisions of section 534(c), timely submitted on January 14, 1980, a statement of the alleged grounds and reasons upon which it relies to establish that all or part of its earnings and profits for the taxable year ending August 31, 1975, were not permitted to accumulate beyond the reasonable needs of its business. Its stated reasonable business needs included the expansion of the corporation's business and its building, the maintenance of a minimum net worth imposed by a real estate mortgage, and sufficient working capital necessary for petitioner to meet its operating cycle requirements. This statement was signed by Dwight I. Hurd, as the assistant secretary, on January 14, 1980. [3]
*455 During the taxable year ending August 31, 1975, State Office had one class of stock which was issued and outstanding. The shareholders and the number of shares held by each were as follows: Shareholder
Number of Shares
J.W. Curtin
177
Helen C. Curtin
14
Michael L. Curtin, John W. Curtin
and Helen C. Curtin, Trustees
13
Julia Curtin Hayes, John W. Curtin
and Helen C. Curtin, Trustees
13
Nanette Curtin, John W. Curtin
and Helen C. Curtin, Trustees
13
Total
230
Prior to 1972 petitioner was located in downtown Columbus, Ohio. In the spring of 1972, petitioner's lease was not renewed and it arranged for a new building to be guilt in the Busch Corporate Center, which was located on the outskirts of Columbus. The building was completed within approximately 60 days. When the company moved into the new building, it turned out that the warehouse space was insufficient. Sometime in 1972 or 1973, petitioner purchased a small strip of land adjacent to the new building for the purpose of building a warehouse addition. This land was suitable only for an addition to the building. At about this same time, Donald Collins, a designer of office layouts for *456 the company, made an architectural drawing of the expansion of the existing warehouse on this strip of land. The drawing illustrated the inside and outside dimensions of the building and the location of doorways, counter space, and shelving. It also indicated that the walls of the addition would be 1 foot thick and constructed of brick. Mr. Collins had taken 2 years of architecture classes at Ohio State University and had been drawing office layouts for about 6 or 7 years. Petitioner did not secure any other blueprints or plans for the addition to the building and no cost estimates of construction were ever obtained. However, it would have been a relatively easy task to build this addition as the Busch Corporate Center required that the addition must match the existing structure and the same type of brick had to be used. Also, Mr. Curtin believed that the original contractor would be able to complete the addition at any time. The minutes of the directors' meeting of petitioner dated August 18, 1972, stated that the funds were not available to pay a dividend equal to the amounts paid in the past, as the company had lost its lease and constructed a new building. Similarly, the *457 minutes of the directors' meeting of petitioner dated August 1, 1973, stated that the amount of the dividend would be nominal "because of the expense of relocation and the necessity to build additional warehouse space in the near future." The minutes of the directors' meeting of petitioner dated August 2, 1974, stated as follows: Mr. Curtin announced that the cash-flow position was improving and that the amount of outstanding accounts receivable had been reduced but that it was still necessary to finance many of the customer purchases as payment of accounts were slow. Mr. Curtin also reported that storage space was overcrowded and that an addition to the warehouse facilities would be necessary. He recommended that we not proceed with construction at this time because of the high construction costs. * * * Finally, the minutes of the directors meeting of petitioner dated August 11, 1975, stated as follows: The operating capital needs to finance inventory and accounts receivable have not diminished and there is still a need for additional warehouse space. Because of the high cost of materials and construction, the Directors agreed to delay the project for the time being until *458 more capital was available. * * * Overall, Mr. Curtin decided that the addition to the building would not be built until business started to "pick up." When the company moved from the downtown area to the Busch Corporate Center, it lost its retail walk-in trade which constituted the major buyers of stationery and paper. This translated into a reduction in sales of about $ 350,000 a year. In addition, in December 1974, business in general fell drastically and continued to be depressed until at least the end of the fiscal year, August 31, 1975. Sometime in late 1974 or early 1975, Mr. Curtin laid off 3 of the company's 6 sales personnel. The nature of petitioner's business was also changing as the size of the contracts for the company's products was getting larger. This presented a different problem for the company since an increased amount of cash was needed to purchase all of the merchandise necessary for these larger contracts and pay for it prior to delivery to its customers. In addition, its larger customers would not make full payment for a period of anywhere from 3 to 6 months. Thus, there was a substantial lag time between the date that petitioner paid for the merchandise *459 and the time in which its customers would pay the company for the merchandise. There were a number of reasons that petitioner needed to maintain a substantial cash balance. First, it needed to maintain a significant amount of money in its accounts at four different banks, as they were customers of petitioner and it was important to do a substantial business with each bank. Second, on the purchase of its inventory, petitioner always had a practice of paying its bills within a few days after receipt so that it could take advantage of a cash discount offered by its suppliers. The company always needed to have enough cash on hand to be able to pay its bills not later than 10 days after the end of the month, if necessary. In addition, the company would generally accumulate the greatest amount of cash in the final 6 months, and particularly the final 2 or 3 months of its fiscal year. This would occur because the company's major suppliers would be closed during the months of July and August. As a result, petitioner did not receive or pay for any merchandise during those months. Meanwhile, its customers, who were not offered a cash discount and, therefore, generally did not pay until *460 approximately 30 days after the billing, were paying off their past accumulated debts owed to petitioner for merchandise during that same period. Thus, during these summer months, petitioner was not spending much of its cash for merchandise but at the same time was receiving a significant amount of cash from its customers who were paying off their accounts. In July 1975 Mr. Curtin had decided to try to sell the business. Mr. Curtin had known Donald O. Hughes and he asked Mr. Hughes for his advice as to how to go about selling the business. At that time, Mr. Hughes became interested in purchasing the company. Mr. Hughes was very interested in owning a business of his own and he was an accountant and had been a financial executive for various companies for 20 years in positions ranging from comptroller to vice president of finance and administration. After talking with Mr. Curtin, Mr. Hughes contacted Dwight I. Hurd who was a partner in the firm of Emens, Hurd, Kegler & Ritter, located in Columbus, Ohio. Mr. Hurd specialized in handling the affairs of medium and smaller sized businesses, with an emphasis on tax and securities matters. After recognizing that petitioner had about *461 $ 300,000 in cash, Mr. Hurd suggested that Mr. Hughes purchase 1 share of stock and then have the corporation redeem the remaining shares of stock so that Mr. Hughes would end up as the 100 percent owner of the corporation. In a handwritten letter dated August 3, 1975, addressed to Mr. Hughes, Mr. Curtin stated: "As per our conversation, the following is the pertinent data relative to the sale of the capital stock of the Corp. for $ 400,000.00." This letter also described the assets of the business, the shareholders and number of shares held by each at that time. This letter represented the terms of the tentative agreement for the sale of the company to Mr. Hughes. In an agreement dated September 15, 1975, Mr. Curtin sold Mr. Hughes 1 share of common stock of petitioner for $ 1,739.13. The agreement also provided that Mr. Hughes would become affiliated with the corporation as a director and officer. Prior to that time, Mr. Hughes was not connected with petitioner in any capacity. Pursuant to a stock redemption agreement dated September 22, 1975, petitioner redeemed 229 shares out of the total outstanding common shares of 230. As a result, Mr. Hughes became the 100 percent *462 owner of petitioner. Petitioner redeemed these shares at the rate of $ 1,739.13 per share. The shareholder, number of shares held, and the total redemption price were as follows: Number of
Shareholder
Shares
Total Redemption Price
J. W. Curtin
176
$306,086.88
Helen C. Curtin
14
24,347.82
Michael L. Curtin,
John W. Curtin and
Helen C. Curtin, Trustees
13
22,608.69
Julia Curtin Hayes,
John W. Curtin and
Helen C. Curtin, Trustees
13
22,608.69
Nanette Curtin,
John W. Curtin and
Helen C. Curtin, Trustees
13
22,608.69
The stock redemption was accomplished on October 1, 1975, and the cash was paid by petitioner in the amount shown above. Petitioner obtained a loan in the amount of $ 175,000 in order to complete the stock redemption. Petitioner's cash on hand was utilized for the balance of the total redemption cost. The following schedule reflects petitioner's total accumulated earnings as of the taxable years ending August 31, 1974, August 31, 1975, and August 31, 1976, without considering the adjustment determined by respondent at issue herein with respect to the claimed bad debt expense and without considering the effect of any net operating *463 loss carrybacks: Taxable Years Ended
8/31/74
8/31/75
8/31/76
Retained Earnings Per Books
$227,439.45
$266,609.65
$248,001.00
Plus: Retained Earnings capitalized
in 1962
122,300.00
122,300.00
122,300.00
Retained Earnings capitalized
in 1964
38,000.00
38,000.00
38,000.00
Retained Earnings capitalized
in 1970
57,500.00
57,500.00
57,500.00
Total accumulated earnings
$445,239.45
$484,409.65
$465,801.00
Petitioner paid cash dividends for the years and in the amounts as follows: Fiscal Year Ended
Amount Per Share
8-31-56
$2
8-31-58
2
8-31-59
2
8-31-61
2
8-31-62
3
8-31-63
7
8-31-64
9
8-31-65
20
8-31-66
175
8-31-67
110
8-31-68
110
8-31-70
90
8-31-71
90
8-31-72
91
8-31-73
1
8-31-74
1
8-31-75
20
For the calendar year ending August 31, 1975, petitioner's accounts receivable, sales and net liquid assets were as follows: ACCOUNTS RECEIVABLE
Taxable year ended August 31, 1975
September 1974
$101,933.16
October 1974
133,247.76
November 1974
145,409.61
December 1974
146,890.97
January 1975
85,268.42
February 1975
105,641.65
March 1975
83,180.57
April 1975
93,945.96
May 1975
93,136.72
June 1975
94,040.38
July 1975
64,211.17
August 1975
72,652.65
*464 SALES
Taxable year ended August 31, 1975
Sales on
Cash
Account
Sales
Total
September 1974
$82,713.34
$650.74
$83,364.08
October 1974
116,751.95
818.49
117,570.44
November 1974
101,792.18
584.33
102,376.51
December 1974
135,069.94
780.82
135,850.76
January 1975
85,592.09
1,047.46
86,639.55
February 1975
127,779.89
729.56
128,509.45
March 1975
86,815.57
687.52
87,503.09
April 1975
81,520.88
581.40
82,102.28
May 1975
77,267.81
452.18
77,719.99
June 1975
72,468.15
591.73
73,059.88
July 1975
61,514.71
760.14
62,274.85
August 1975
89,921.79
979.16
90,900.95
NET LIQUID ASSETS
Taxable year ended August 31, 1975
Current Assets: Cash
$ 355,575.06
Accounts Receivable
73,810.73
Inventory
98,056.27
$ 527,442.06
Current Liabilities: Accounts Payable
66,947.28
Accrued Expenses
48,698.41
115,645.69
Net Liquid Assets
$411,796.37
Petitioner's net income, after taxes and without considering the net operating loss carrybacks or the adjustments determined by respondent with respect to the bad debt reserve for the years in issue herein, was as follows for the years specified: *465 Fiscal Year Ended
Amount
8-31-70
$37,930.16 8-31-71
27,589.15 8-31-72
34,589.75 8-31-73
44,772.41 8-31-74
49,551.05 8-31-75
43,770.20 8-31-76
(18,509.00)
Petitioner's cost of goods sold and operating expenses (other than depreciation and Federal income taxes) were a total of $ 1,042,019 for the taxable year ending August 31, 1975. [4] Petitioner's inventory and accounts payable for the taxable year ending August 31, 1975, was $ 98,056 and $ 46,139, respectively. The monthly amounts of these items for that year are not in the record. However, monthly amounts were available for the following taxable year which indicated that accounts payable were at a low level on August 31 and that the inventory of petitioner was the highest during the months of May and June and was at a low level on August 31. Accounts receivable were at their lowest level at the end of August in both 1975 and 1976. These levels of these accounts were normal for petitioner's business. *466 The financial statements of petitioner were unaudited for the taxable year ending August 31, 1975. However, these statements were used in the ordinary course of petitioner's business and were submitted to various banks for the purposes of obtaining credit. The balance sheet and income statement of petitioner for the years ending August 31, 1975, 1974, and 1973 were as follows: J.W. CURTIN CO.
BALANCE SHEET (UNAUDITED)
At August 31, 1975, 1974 & 1973 ASSETS
1975
1974
1973
Current assets
Cash
$355,575.06
$296,863.35
$223,005.80
[5] Accounts receivable (Note #1) 69,565.30
96,586.67
128,040.70
Merchandise inventory C or M
98,056.27
104,733.73
94,367.10
523,196.63
498,183.75
445,413.60
Property & Equipment (Note #2)
At cost less accumulated
depreciation
205,848.57
220,289.99
223,300.28
Other assets & deferred charges
Prepayments
1,309.91
1,602.95
2,604.20
Advances to employees
3,044.25
1,309.91
1,602.95
5,648.45
Total assets
$730,355.11
$720,076.69
$674,362.33
*467 LIABILITIES & STOCKHOLDER'S EQUITY
1975
1974
1973
Current liabilities
Accounts payable - trade
$ 66,947.28
$ 57,905.32
$ 54,811.95
Taxes payable - income
18,162.16
32,345.26
33,714.94
- other              4,536.25
5,266.28
2,932.03
Wages accrued
26,000.00
37,000.00
33,510.00
115,645.69
132,516.86
124,968.92
Mortgage payable (Note #3)
118,099.77
130,120.38
141,275.01
Stockholder's equity
Common stock (230 shs)
230,000.00
230,000.00
230,000.00
Retained earnings
266,609.65
227,439.45
178,118.40
496,609.65
457,439.45
408,118.40
Total liabilities & stockholder's
equity
$730,355.11
$720,076.69
$674,362.33
J.W. CURTIN CO.
Statement of Income & Retained Earnings (Unaudited)
years ended August 31, 1975, 1974 & 1973 1975
1974
1973
Net sales
$1,112,740.61
$1,287,028.39
$1,256,360.77
Cost of goods sold
718,234.25
874,769.90
868,821.00
Gross profit
$ 394,506.36
$ 412,258.49
$ 387,539.77
Operating expenses
338,226.54
338,238.27
324,488.23
Net operating revenue
$ 56,279.82
$ 74,020.22
$ 63,051.54
Other income
Discounts taken
11,603.05
13,460.27
13,278.35
Interest
1,033.45
585.11
991.15
Commissions
2,671.15
4,896.42
5,804.43
Miscellaneous income
475.35
15,783.00
18,941.80
20,073.93
Total income
$ 72,062.82
$ 92,962.02
$ 83,125.47
Other deductions
Interest expense
9,351.39
10,217.37
9,566.03
Provision for Federal
income tax
18,941.23
33,193.60
28,787.03
28,292.62
43,410.97
38,353.06
Net income
$ 43,770.20
$ 49,551.05
$ 44,772.41
Retained earnings
Balance beginning of year
227,439.45
178,118.40
133,575.90
Total
$ 271,209.65
$ 227,669.45
$ 178,348.31
Dividends paid
4,600.00
230.00
230.00
Balance End of Year
$ 266,609.65
$ 227,439.45
$ 178,118.31
Earnings per share
$ 190.00
$ 215.00
$ 194.00
Percent of gross profit
to sales
35.5 32.0 30.9 *468 On February 28, 1980, respondent issued a statutory notice of deficiency to State Office determining that petitioner had accumulated taxable income of $ 41,449 for the taxable year ending August 31, 1975, subject to the tax imposed by section 531. During the years here in issue, petitioner used the reserve method of accounting for bad debts in lieu of deducting specific debts as they became worthless. During the years ending August 31, 1975 and 1976, petitioner added the amounts of $ 2,980 and $ 3,696, respectively, to its bad debt reserve. In his deficiency notice, respondent determined that for the taxable year ending August 31, 1975, the proper allowable addition to the reserve for bad debts was $ 701, rather than the amount claimed by petitioner of $ 2,980. Accordingly, petitioner's income was increased in the amount of $ 2,279 for that year. This computation was made by multiplying a percentage, which was obtained by dividing the total amount of net bad debts for the 6-year period ending in 1975 into the total year-end receivables for the same 6-year period, by the balance in the accounts receivable of petitioner at the yearend. Similarly, respondent determined that, *469 under this method, petitioner was entitled to no addition to its bad debt reserve account for its fiscal year ended August 31, 1976, and the entire deduction of $ 3,696 claimed as an addition to the reserve for the fiscal year 1976 was disallowed. OPINION The first issue presented is whether State Office is subject to the accumulated earnings tax imposed by section 531. Section 532(a) provides that every corporation formed or availed of for the purpose of avoiding income tax with respect to its shareholders, by permitting earnings and profits to accumulate instead of being distributed, shall be subject to the accumulated earnings tax imposed by section 531. Section 533(a)[6] provides that the accumulation of earnings and profits beyond the reasonable needs of the business is determinative of the purpose to avoid income tax with respect to its shareholders, unless the corporation proves to the contrary by a preponderance of the evidence. *470 Section 535(a)[7] defines "accumulated taxable income" (the recomputed income of the corporation against which the tax under section 531 is imposed) as the taxable income of the corporation, as adjusted in section 535(b), less the dividends paid deduction and the accumulated earnings credit as defined in section 535(c). Insofar as here relevant, this accumulated earnings credit is the amount of the corporation's earnings and profits which are retained for the reasonable needs of the business. Where a taxpayer can show that all its current earnings were accumulated for the reasonable needs of the business, there is no accumulated earnings tax since the accumulated credit eliminates the amount against which the tax is imposed. See, e.g., Magic Mart, Inc. v. Commissioner,51 T.C. 775, 799 (1969); Faber Cement Block Co., Inc. v. Commissioner,50 T.C. 317, 336 (1968); John P. Scripps Newspapers v. Commissioner,44 T.C. 453, 474 (1965). Whether a *471 taxpayer's accumulation of earnings and profits is in excess of its reasonable business needs is a factual question. Helvering v. National Grocery Co.,304 U.S. 282 (1938); Doug-Long, Inc. v. Commissioner,72 T.C. 158, 170 (1979), supplemental opinion 73 T.C. 71 (1979), on appeal (2d Cir., Jan. 11, 1980). In this regard, we recognize that the accumulated earnings tax is a penalty tax and for that reason should be strictly construed. Ivan Allen Co. v. United States,422 U.S. 617, 626 (1975). Respondent does not argue that State Office was formed for the purpose of avoiding income tax with respect to its shareholders, only that it was availed *472 of for that purpose. Thus, the arguments of both parties center on the amount necessary to meet the reasonable needs of the business. Section 537[8] provides that for the purpose of the accumulated earnings tax, the term "reasonable needs of the business" includes the reasonably anticipated needs of the business. Also, the determination of the reasonable needs of the business is based on the facts which exist at the end of petitioner's taxable year and "subsequent events shall not be used for the purpose of showing that the retention of earnings or profits was unreasonable at the close of the taxable year if all the elements of reasonable anticipation are present at the close of such taxable year." Section 1.537-1(b)(2), Income Tax Regs. Once we determine the amount necessary to satisfy the needs of the business, we will not simply compare this amount with petitioner's total accumulated earnings and profits, but will look to the amount of accumulated earnings and profits which are reflected in the net liquid assets of State Office. Ivan Allen Co. v. United States,supra at 628; *473 Smoot Sand & Gravel Corp. v. Commissioner,274 F.2d 495, 501 (4th Cir. 1960), affg. a Memorandum Opinion of this Court; Montgomery Co. v. Commissioner,54 T.C. 986, 1008 (1970). As the Supreme Court stated in Ivan Allen Co.,supra at 628, "The question, therefore, is not how much capital of all sorts, but how much in the way of quick or liquid assets, it is reasonable to keep on hand for the business." Section 1.537-2(b)(4), Income Tax Regs., states that a reasonable need of the business includes an accumulation of earnings and profits to pay for the necessary *474 working capital of the business. A company needs an amount of working capital equal to its reasonably anticipated costs of operating its business for a single operating cycle. One operating cycle consists of the average amount of time necessary to first acquire the inventory and then receive the actual cash due upon the sale of the merchandise. The length of the operating cycle is then converted into a percentage of one year and multiplied by the total operating expenses, not including depreciation and Federal income taxes. Atlas Tool Co. v. Commissioner,70 T.C. 86, 117 (1978), affd. 614 F.2d 860 (3d Cir. 1980); Ready Paving & Construction Co. v. Commissioner,61 T.C. 826, 835 (1974); Magic Mart, Inc. v. Commissioner,supra.[9] An operating cycle consists of an inventory cycle, which is determined by dividing a monthly inventory by the cost of goods sold, and an accounts receivable cycle, which is determined by dividing a monthly accounts receivable by the net sales. These two amounts are then added together and represent the total length of one operating cycle in terms of a decimal part of one year. *475 First, we note that both parties agree that the use of the so-called Bardahl formula described above is an appropriate way to measure the working capital requirement of petitioner's business. Petitioner stated that, under this formula, its working capital requirements for the taxable year 1975 were $ 250,000. However, petitioner has not set forth any of the figures used in making this computation.Respondent did not comment on petitioner's alleged working capital requirements but he did request as a finding of fact that petitioner's proper working capital was $ 182,097.45.[10]
*476 Petitioner did not submit into evidence a breakdown of its monthly amounts of inventory and accounts payable for the taxable year ending August 31, 1975. Monthly breakdowns for that year were submitted by petitioner for its sales and accounts receivable. These figures, along with the testimony of Mr. Curtin, the president and operating officer of petitioner during the taxable year 1975, confirm that petitioner's business was cyclical in nature and that the ending balances of inventory and accounts receivable as of August 31, 1975, were extremely low. After considering the evidence, we conclude that petitioner's accounts receivable should be adjusted upward to an amount equal to the average of the three highest consecutive months.Although the business had been down somewhat, we think it appropriate to use the average of the months of October, November, and December 1974 or $ 141,849. Similarly, petitioner's inventory was unrealistically low, [11] as its suppliers were not operating during the summer months. Although specific monthly inventory figures were not presented at trial, we conclude that a monthly inventory of $ 120,000 was required by petitioner. *477 As indicated on its balance sheet, for its taxable year ending August 31, 1975, petitioner had cost of goods sold of $ 718,234, inventory of $ 120,000, and net sales of $ 1,112.741. Adding its cost of goods sold to its operating expenses of $ 323,785, petitioner's operating expenses for the year totaled $ 1,042,019. Petitioner's monthly accounts receivable as determined above was $ 141,849. After dividing petitioner's monthly accounts receivable into net sales and dividing its monthly inventory into cost of goods sold, adding these two decimals together and multiplying by 52 weeks, petitioner's operating cycle was 15.32 weeks. Petitioner's operating expenses amounted to $ 20,039 per week. If the number of weeks necessary to complete one operating cycle is then multiplied by this per-week cost, petitioner's working capital requirements for one operating cycle totals $ 306,997. We recognize that in many cases in which the operating cycle approach has been used, the operating cycle has been reduced by the credit or payables cycle. C.E. Hooper, Inc. v. United States,210 Ct. Cl. 615, 539 F.2d 1276, 1281 (1976), and cases there cited. [12] But see Central Motor Co. v. United States,583 F.2d 470, 478-481 (10th Cir. 1978). *478 [13] This cycle is the average amount of time during which the corporation's accounts payable for the purchase of inventory remain unpaid. The underlying theory is that new inventory will be used to start the operating cycle as soon as it is received, but will not require a cash outlay until the subsequent time the accounts payable are actually paid. As a result, a company's actual cash requirements are reduce to the extent that payment for inventory received is delayed. After considering petitioner's business practice of immediate payment for purchases and the fact that the operating cycle is not a set "test" to be inflexibley applied, we conclude that a reduction in the operating cycle for the payables cycle is inappropriate. Atlas Tool Co. v. Commissioner,70 T.C. 86, 116 (1978), affd. 614 F.2d 860 (3d Cir. 1980). The president of State Office, Mr. Curtin, testified that it was his practice during the *479 years here in issue to always take advantage of immediate cash payment discounts offered by petitioner's suppliers of inventory. In fact, he stated that this was one of the principal reasons that he had always maintained such a large cash reserve. The second reason for accumulating earnings and profits alleged by petitioner is the need to expand its building and business in general. On these two factors, the burden of proof is upon respondent. See footnote 3, supra.Section 537(a) provides that the reasonable needs of a business include the reasonably anticipated needs of the business. As a general rule, the accumulation of earnings will be deemed in excess of the company's reasonable needs if the accumulation "exceeds the amount that a prudent businessman would consider appropriate for the present business purposes and for the reasonably anticipated future needs of the business." Section 1.537-1(a), Income Tax Regs.Section 1.537-1(b)(1), Income Tax Regs., also provides as follows: (b) Reasonably anticipated needs. (1) In order for a corporation *480 to justify an accumulation of earnings and profits for reasonably anticipated future needs, there must be an indication that the future needs of the business require such accumulation, and the corporation must have specific, definite, and feasible plans for the use of such accumulation. Such an accumulation need not be used immediately, nor must the plans for its use be consummated within a short period after the close of the taxable year, provided that such accumulation will be used within a reasonable time depending upon all the facts and circumstances relating to the future needs of the business. * * * Respondent contends that petitioner's plans to expand its building by constructing an addition to its warehouse were vague and that no specific action had been taken in furtherance of those plans. While it is true that Mr. Curtin testified that business had declined during the year and that these plans had been in existence since sometine in 1972 or 1973, we conclude that, based on all of the evidence, the need to accumulate earnings for the expansion of its building constituted a reasonable business need. In reaching this result, we are mindful of the fact that we have been *481 very reluctant to substitute our judgment of what is necessary for the business for that of the company's management. See Magic Mart, Inc. v. Commissioner,supra at 795. Although petitioner's expansion efforts had been in the planning stage for a period of time prior to 1975, Mr. Curtin testified, in effect, that since the company needed a substantial amount of cash to carry its inventory, and business had declined after it moved into the new building, he felt that the company was not in the proper financial condition to begin construction. This view was reflected in the company's minutes of each of its board of directors' meetings for the years 1973, 1974, and 1975. Also, petitioner had taken the first important step by purchasing a small adjacent strip of land, which was suitable only for an expansion of the building. The fact that more specific plans had not been made was not of critical importance, as the new werehouse addition had to match the existing building and Mr. Curtin believed that the original contractor would be able to begin construction at any time. Based on all of the facts presented, we conclude that petitioner's building expansion plans *482 were sufficiently definite, specific and feasible to justify an accumulation for that purpose. According to petitioner's statement of its reasons for accumulating earnings and profits, the estimated cost of the warehouse, shelving and parking lot expansion would be $ 60,000, $ 15,000, and $ 15,000, respectively. The final reason for accumulating earnings which we will consider is the expansion of petitioner's business. Petitioner contends that it needed additional capital to expand its business generally and to satisfy its increasing need for more cash to pay for inventory because of the changing nature of its business towards larger sized contracts. Respondent argues that since petitioner's business was declining, it had no need to purchase additional inventory or hire additional sales staff. While we agree that petitioner's business had declined somewhat in 1975, this decrease was principally due to a general business decline which, from its nature, was temporary. We conclude from the record that petitioner needed to be in a position to purchase more inventory and hire more staff for the anticipated increase in its business when the temporary general business decline ceased. *483 An important factor affecting our conclusion is that the nature of petitioner's business was changing as its contracts were becoming much larger. These contracts required that petitioner be in a highly liquid position, as it had to purchase sufficient inventory to deliver in satisfaction of contracts, but it would not receive full payment for its merchandise until anywhere from 3 to 6 months after delivery. While petitioner estimated, in various documents, that it would need anywhere from $ 95,000 on up, we need only say that petitioner required at least $ 15,000, the amount necessary to put its working capital requirements equal to its net liquid assets of $ 411,796. We conclude that petitioner did need well in excess of $ 15,000 for its planned business expansion. Considering all of the evidence, we conclude that petitioner's working capital requirements at least equaled its net liquid assets. Therefore, we conclude that petitioner did not accumulate earnings and profits in excess of its business needs and is not liable for the accumulated earnings tax for its fiscal year 1975 as determined by respondent. [14]
*484 The second issue presented is whether petitioner was entitled to deduct the amounts of $ 2,980 [15] and $ 3,696 for the years ending August 31, 1975 and 1976 as additions to its bad debt reserve. Section 166(c)[16] provides that in lieu of deducting only those bad debts that actually become worthless within the taxable year, a taxpayer may deduct a reasonable addition to its reserve for bad debts. The reserve is the approximate amount of loss which a taxpayer can reasonably expect to result from outstanding debts as of the close of the taxable year. Thor Power Tool Co. v. Commissioner,439 U.S. 522, 546 (1979). Section 1.166-4(b)(1), Income Tax Regs., provides as follows: *485 (b) Reasonableness of addition to reserve--(1) Relevant factors. What constitutes a reasonable addition to a reserve for bad debts shall be determined in the light of the facts existing at the close of the taxable year of the proposed addition.The reasonableness of the addition will vary as between classes of business and with conditions of business prosperity. It will depend primarily upon the total amount of debts outstanding as of the close of the taxable year, including those arising currently as well as those arising in prior taxable years, and the total amount of the existing reserve. Section 166(c) also provides that a deduction for a reserve for bad debts is allowable in the discretion of the Commissioner. With respect to this statutory language, the Supreme Court in Thor Power Tool Co.,supra at 547-548, stated: the courts uniformly have held that the Commissioner's determination of a "reasonable" (and hence deductible) addition must be sustained unless the taxpayer proves that the Commissioner abused his discretion. The taxpayer is said to bear a "heavy burden" in this respect. He must show not only that his own computation is reasonable *486 but also that the Commissioner's computation is unreasonable and arbitrary. [Fn. refs. omitted.] In his deficiency notice, respondent recomputed the proper addition to the reserve under the formula contained in Black Motor Co. v. Commissioner,41 B.T.A. 300 (1940), affd. 125 F.2d 977 (6th Cir. 1942). [17] Petitioner has not questioned the propriety of respondent's computation. Rather, it submitted its own computation at trial which considers, as a bad debt, the three-month credit memos issued to customers who dispute, in some manner, the price, quality or quantity of merchandise received. On the state of this record, we conclude that petitioner has not carried its burden of proof. Not only has petitioner failed to show whether, in fact, these credit memos constitute "debts," it has not introduced any evidence or made any argument that respondent's determination is arbitrary and unreasonable. *487 Decision will be entered under Rule 155.
Footnotes
1. Unless otherwise indicated, all statutory references are to the Internal Revenue Code of 1954, as amended and in effect during the years in issue. ↩
2. On its return for the taxable year ending August 31, 1976, petitioner reported a net operating loss of $ 41,054. The effect of respondent's disallowance of a portion of petitioner's addition to its reserve for bad debts for 1976 was to reduce the amount of the loss for that year which could be carried back to the fiscal year 1973. The taxable year ending August 31, 1973, is involved because of a previously allowed claim based on a tentative net operating loss carryback to that year from the year ending August 31, 1976.↩
3. At a hearing prior to the time of trial with respect to the shifting of the burden of proof to respondent under section 534(c), the Court ruled that the burden was upon respondent to establish that State Office's accumulated earnings and profits were not needed for its building and business expansion, and that the burden of proof was upon petitioner with respect to the necessity for accumulating earnings and profits in order to maintain substantial net worth as required by a real estate mortgage and as to the necessity for funds to meet its oiperating cycle requirements.↩
4. The parties stipulated that petitioner's cost of goods sold and operating expenses (other than depreciation) were a total of $ 1,051,371 for the taxable year ending August 31, 1975. However, the financial statements received as evidence at trial indicate that, in fact, the operating expenses were $ 1,042,019.↩
5. Note 1 to the financial statements explained that the accounts receivable balance was arrived at as follows: accounts receivable -- trade ($ 72,652.65) plus "other" ($ 1,158.08) less reserve for doubtful accounts ($ 4,245.43) equals $ 69,565.30.↩
6. Sec. 533(a) provides as follows: SEC. 533. EVIDENCE OF PURPOSE TO AVOID INCOME TAX. (a) Unreasonable Accumulation Determinative of Purpose.--For purposes of section 532↩, the fact that the earnings and profits of a corporation are permitted to accumulate beyond the reasonable needs of the business shall be determinative of the purpose to avoid the income tax with respect to shareholders, unless the corporation by the preponderance of the evidence shall prove to the contrary.
7. Sec. 535(a) provides as follows: SEC. 535. ACCUMULATED TAXABLE INCOME. (a) Definition.--For purposes of this subtitle, the term "accumulated taxable income" means the taxable income, adjusted in the manner provided in subsection (b), minus the sum of the dividends paid deduction (as defined in section 561↩) and the accumulated earnings credit (as defined in subsection (c)).
8. Sec. 537 reads in part as follows: SEC. 537. REASONABLE NEEDS OF THE BUSINESS. (a) General Rule.--For purposes of this part, the term "reasonable needs of the business" includes-- (1) the reasonably anticipated needs of the business, (2) the section 303 redemption needs of the business, and (3) the excess business holdings redemption needs of the business.↩
9. See also A.T. Williams Oil Co. v. Commissioner,T.C. Memo. 1981-461; Proctor v. Commissioner,T.C. Memo. 1981-436; Suwannee Lumber Mfg. Co. v. Commissioner,T.C. Memo. 1979-477; Alabama Coca-Cola Bottling Co. v. Commissioner,T.C. Memo. 1969-123; Bardahl Mgf. Corp. v. Commissioner,T.C. Memo. 1965-200↩.
10. Respondent's computation was as follows: ↩
Cost of goods sold
$ 718,234.25
Average inventory
101,395.00
Turnover factor
.1412 Net sales
$1,112,740.51
Average accounts receivable
101,629.90
Turnover factor
.0913 Operating cycle factor
.2325 Total cash expenses
$1,051,371.00
Average accounts payable
62,426.30
Credit cycle factor
(.0593)
Net operating cycle factor
.1732 Total Cash expenses
$1,051,371.00
Times: Net operating cycle factor
.1732
Working capital required
$ 182,097.45
Working capital available
411,796.37
Excess accumulation
$ 229,698.92
11. A document entitled "Working Capital Needs" prepared by Mr. Hughes, based on his recollection of the company's financial requirements as of August 31, 1975, indicated that an additional $ 50,000 would be required to meet the peak inventory needs of petitioner.↩
12. See also Suwannee Lumber Mfg. Co. v. Commissioner, T.C. 1979-477; Alma Piston Co. v. Commissioner,T.C. Memo. 1976-107↩. 13. See also. A.T. Williams Oil Co. v. Commissioner,T.C. Memo. 1981-461↩.
14. Having concluded that petitioner did not accumulate earnings beyond the reasonable needs of its business, it is unnecessary for us to consider respondent's arguments based on the use of cash by petitioner in its fiscal year 1976 to redeem most of its stock or petitioner's explanation of the reason for the losses suffered by petitioner in 1976. See, however, Penn Needle Art Co. v. Commissioner,T.C. Memo. 1958-99, and Barrett Hamilton, Inc. v. United States, an unreported case ( E.D.Ark. 1959 4 AFTR2d 5612↩).
15. In his deficiency notice respondent determined that the allowable addition was $ 701. Therefore, the amount of $ 2,279 remains in issue. ↩
16. Sec. 166(c) provides as follows: (c) Reserve for Bad Debts.--In lieu of any deduction under subsection (a), there shall be allowed (in the discretion of the Secretary or his delegate) a deduction for a reasonable addition to a reserve for bad debts.↩
17. In Thor Power Tool Co. v. Commissioner,439 U.S. 522, 548-549 (1979), the Supreme Court stated as follows: "Since it first received the approval of the Tax Court in 1940, the Black Motor bad debt formula has enjoyed the favor of all three branches of the Federal Government. * * * we are not inclined to disturb the Black Motor↩ formula now."